ATTORNEYS FOR APPELLANT
Daniel G. McNamara
Patrick L. Proctor
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEES
Gregory F. Zoeller
Attorney General of Indiana

David A. Arthur
Stephanie L. Rothenberg
Deputy Attorneys General
Indianapolis, Indiana

# In the
# Indiana Supreme Court



FILED
Apr 16 2014, 10:17 am

CLERK
of the supreme court,
court of appeals and
tax court

No. 02S05-1305-PL-364

DAVID BLEEKE,

*Appellant (Plaintiff below),*

v.

BRUCE LEMMON, IN HIS CAPACITY AS COMMISSIONER OF THE INDIANA DEPARTMENT OF CORRECTION; THOR R. MILLER, AS CHAIRMAN OF THE INDIANA PAROLE BOARD; VIRGIL R. MADDEN, AS VICE CHAIRMAN OF THE INDIANA PAROLE BOARD; RANDALL P. GENTRY, AS A MEMBER OF THE INDIANA PAROLE BOARD; VALERIE J. PARKER, AS A MEMBER OF THE INDIANA PAROLE BOARD; CHARLES F. MILLER, AS A MEMBER OF THE INDIANA PAROLE BOARD; MIA KELSAW, AS A PAROLE SUPERVISOR FOR THE INDIANA PAROLE BOARD, FORT WAYNE DISTRICT 2; DAMITA VANLANDINGHAM, AS A PAROLE SUPERVISOR FOR THE INDIANA PAROLE BOARD, FORT WAYNE DISTRICT 2; SUSAN FEASBY, AS A PAROLE SUPERVISOR FOR THE INDIANA PAROLE BOARD, FORT WAYNE DISTRICT 2,

*Appellees (Defendants below).*

Appeal from the Allen Superior Court, No. 02D01-1005-PL-164
The Honorable Nancy Eschcoff Boyer, Judge
On Petition to Transfer from the Indiana Court of Appeals, No. 02A05-1201-PL-25

**April 16, 2014**

**David, Justice.**

In this case, a parolee convicted of a sex crime against an adult female challenges a number of his parole conditions, including several that prohibit him from having contact with children—even his own. He also challenges the constitutionality of a state treatment program for sex offenders that he must participate in as part of his parole, claiming that under the program he is required to provide self-incriminating statements about his underlying offense and sexual history without immunity and under the threat of being found in violation of his parole.

We conclude that some of his parole conditions are impermissible on several grounds, but find no fault with the remainder. We likewise find no constitutional flaw in the state treatment program.

**Facts and Procedural History**

On January 31, 2005, David Bleeke was convicted of residential entry and attempted criminal deviate conduct in Allen County, Indiana, and sentenced to ten years in the Indiana Department of Correction. His victim was an adult woman who was, at the time of the crime, over the age of twenty-one. Bleeke was incarcerated until March 19, 2008, when he was released to a community transition program. Bleeke completed the community transition

2

program on April 24, 2009, and was released to statutorily mandated parole. He is to remain on parole until 2015.

**Bleeke's Parole Conditions**

The conditions of Bleeke's parole were spelled out in a standardized form initially provided to him before his assignment to the community transition program (and then again when he was released on parole): State Form 49108. Those conditions, among other things, required Bleeke to participate in, and successfully complete, a court-approved sex offender treatment program: the Indiana Sex Offender Management and Monitoring Program ("SOMM"). As part of the SOMM program, Bleeke was required to admit guilt for his offense; refusal to do so, or to otherwise deny responsibility for the offense, would result in him being unsuccessful in his treatment and would violate one of his parole conditions. He was also required to disclose any prior sex-related crimes by way of a "sexual history disclosure exam," administered under a polygraph required by the parole conditions. The conditions relevant to these requirements provided that:

> 1. You shall enroll in, actively participate in and successfully complete an approved sex offender treatment program. You must maintain steady progress toward all treatment goals and may not change treatment providers without prior approval of your parole agent. Prompt payment of any fees is your responsibility.
>
> 2. You shall sign any waiver of confidentiality, release of information, or any other documents required to permit your parole agent and/or behavioral management or treatment providers to examine any and all records, to collaboratively share and discuss your behavioral management conditions, treatment progress, and parole stipulation needs as a team. This permission may extend to: (1) sharing your relapse prevention plan and treatment progress with your significant others and/or your victim and victim's therapist as directed by your parole agent or treatment provider(s),

3

and (2) sharing of your modus operandi behaviors with law enforcement personnel.

21. You shall actively participate in offense specific mental health treatment program(s) approved and ordered by your parole agent at your own expense. You will contact the approved/designated provider within seven (7) days of release to parole to schedule an appointment unless an appointment was already scheduled prior to release on parole. Treatment is considered a behavioral management requirement of your parole and may include plethysmograph or polygraph testing or similar assessment/management tools. Termination from treatment or non-compliance with other required behavioral management requirements will be considered a violation of your parole release agreement. Subsequent treatment referrals, if any, will be at the direction of your parole agent. Should you request and be permitted to change treatment providers, stricter stipulations may be applied.

22. You shall participate in and complete periodic polygraph testing at the direction of your parole agent or any other behavioral management professionals who are providing treatment of [sic] assisting your parole agent in monitoring your compliance with your parole rules and special stipulations.

(App. at 159–60.)

As part of Bleeke's community transition program, in October 2008 Bleeke was ordered to take an "instant offense" polygraph, asking him if he committed the acts underlying his prior conviction. The examination process required Bleeke to sign a form stating that he requested the polygraph "without duress, coercion, force, intimidation, or promises of immunity," authorizing the examiner to share the results with his probation office "and other applicable agencies for whatever purposes they may determine," and acknowledging that the examiner was obliged to comply with "any and all State and Federal laws involving the administration of polygraph testing, which includes proper statutory disclosure and reporting requirements." (App. at 148, 158.) Bleeke refused to sign the form, but offered to proceed with the polygraph examination

4

anyway—instead the examiner stopped the examination and reported Bleeke's non-compliance. Bleeke was ordered to spend a weekend in jail for violating the conditions of the program.

Bleeke was again ordered to conduct an instant offense polygraph after his release from the weekend in jail; this time he signed the consent form and completed the examination. He stated that he completed the form this time because "I did not want to go to jail or back to prison." (App. at 148.) The polygraph examiner concluded that Bleeke "ha[d] not told the entire truth concerning his alleged sexual contact." (App. at 313.) As a result, his provider labeled him as uncooperative and concluded that because he "continues to maintain his innocence to the charges he was convicted for . . . counseling for sex abuse issues is not appropriate." (App. at 314.) Bleeke was then assigned to another provider, with whom he continues to participate, although he has been told that he cannot complete the SOMM program unless he admits his guilt.

Form 49108 also contained limitations on Bleeke's conduct aimed at restricting his contact with children and establishing intimate relationships with other adults. These conditions were imposed by the Indiana Parole Board without any prior individualized assessment of their applicability to Bleeke, but were ordered under the auspices of the Parole Board's authority to impose additional parole conditions that are "reasonably related to the parolee's successful reintegration into the community and not unduly restrictive of a fundamental right." See Ind. Code § 11-13-3-4(b) (2010). The conditions relevant to these restrictions provided that:

> 4. You shall not touch, photograph *(still or moving)*, correspond with *(via letter or e-mail)*, and/or engage in "small talk" or unnecessary conversation with any child, including your own, either directly or via third party, or attempt to do any of the preceding without written approval in advance by your parole agent in consultation with your treatment provider. You must never be in any vehicle or any residence with any child, including your own, even if other adult(s) is/are present, without written approval in advance by your parole agent in consultation with your

5

treatment provider. You must report any inadvertent contact with children to your parole agent within twenty-four (24) hours of contact.

5. You must not reside, visit or be within one thousand (1,000) feet of public parks with playgrounds, pools, rides, and/or nature trails; schools, day care centers, public swimming pools, public beaches, theaters, or any other place where children can reasonably be expected to congregate.

15. You shall refrain from "cruising" activity, frequenting areas where potential victims can be encountered.

17. You shall not stay overnight with any adult and/or establish an intimate and/or sexual relationship with any adult without prior approval by your parole agent and treatment clinician. You must also report whether the person you are having a relationship with has children under the age of eighteen (18) and/or if children under the age of eighteen (18) reside in the person's home.

19. You shall not possess any items on your person, in your vehicle, in your place of residence, or as a part of your personal effects which attract children or that may be used to coerce children to engage in inappropriate or illegal sexual activities. You will not attempt to persuade, whether by words or actions or both, a child to enter a vehicle, structure, or enclosed area, or to otherwise relocate.

20. You shall not join or be associated with any group which promotes activities involving children under eighteen (18) years of age, such as, but not limited to: church or religious youth groups, Boy Scouts, Girl Scouts, Cub Scouts, Brownies, YMCA, YWCA, youth sports teams, public parks, etc.

(App. at 159–60.)

Bleeke was married at the time of his conviction, and stayed married through his incarceration. He and his wife had a son while he was incarcerated, and while Bleeke was in prison he was allowed visits with his wife and son. They had a second son shortly after he was

6

released on mandatory parole. But once he was released from prison, the conditions on Form 49108 prohibited him from having contact with (or photographs of) his eldest son. They also prohibited him from being present at the birth of his second son and from having a relationship with the child (although he was allowed a single photograph). And when Bleeke was released from the community transition program, his parole conditions also prohibited him from living with his wife and children.

**Bleeke's Litigation**

Bleeke filed suit in the United States District Court for the Northern District of Indiana, seeking to enjoin the enforcement of the parole conditions restricting access to his children and wife or, alternatively, requesting that the Parole Board first conduct some sort of hearing as to whether those conditions were warranted. Bleeke v. Server, 2010 WL 299148 at *1 (N.D. Ind. January 19, 2010). The federal court dismissed some of Bleeke's claims, but found that the Parole Board "had a constitutional obligation to provide some procedural safeguard allowing for an individualized determination as to [Bleeke's] risk to his own children before imposing [Bleeke's] parole conditions," and issued a preliminary injunction enjoining enforcement of those conditions until such an assessment was made. Id. at *13.

As a result of the federal court order, the Parole Board held a special hearing on May 3, 2010, concerning Bleeke's parole conditions. Bleeke's SOMM counselor provided a written statement to the Parole Board, saying that "Bleeke has given no reason to believe he is at risk to molest a child. He denies any sexual attraction to children. He also denies deviant sexual fantasies and denies intent to molest a child." (App. at 318.) She also stated that his denials

7

were supported by SOMM-ordered polygraphs. Bleeke testified himself at the hearing and repeated those denials.[1] Bleeke's parole supervisor agreed that there was no evidence that he presented a risk to children, and Bleeke's wife testified that Bleeke had never been inappropriate with, or harmed, his children.

The director of the SOMM program testified that the actuarial program used by SOMM for its determination of recidivism rates did not assess the probability that the recidivistic tendency of a particular offender whose initial victim was an adult would later manifest in an act against a child (a shift in behavior known as "crossing-over"). He also acknowledged that for Bleeke to cross-over in a way that was dangerous to his sons, he would have to cross-over in a number of factors: victim gender, age, and familial relation. He conceded that evaluative processes existed that could provide a more dynamic risk assessment as to the likelihood of such an occurrence, but one had not been done on Bleeke; nor could he speak personally as to the risk Bleeke posed to children because he had not evaluated Bleeke. He would, he said, rely on Bleeke's SOMM counselor.

No witnesses or evidence were presented that showed Bleeke had posed, or would pose, a risk to his children or any other children. And Bleeke again maintained his innocence to the underlying attempted criminal deviate conduct conviction. Nevertheless, after the hearing the Parole Board again imposed all of the same parole conditions on Form 49108. It requested

---

[1] The hearing was not transcribed, but the Parole Board provided Bleeke with a DVD of the proceeding and certified its accuracy. That DVD is part of the record on appeal.

Bleeke's counseling team provide the Parole Board an additional assessment in ninety days detailing Bleeke's compliance with his treatment protocols.[2]

Bleeke then filed suit in the Allen County Superior Court, seeking a declaratory judgment as to the constitutionality of those parole conditions that prohibited him from seeing his children or being in the same home as his wife, along with the statutes underlying those parole conditions. He alleged violations of the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution, and Article 1, sections 12 and 23 of the Indiana Constitution. He similarly claimed that many of the conditions and supporting statutes were unconstitutionally vague, overbroad, or unduly restrictive of his fundamental right to association.

He sought a preliminary injunction barring the Parole Board from enforcing those parole conditions related to restricting his presence near children and establishing a relationship with his wife. Bleeke also challenged the constitutionality of the entire SOMM program, claiming that the requirement for him to admit his guilt and prior offenses and take polygraph examinations, with no promise of confidentiality or immunity, violated the Fifth Amendment to the United States Constitution.

The trial court granted his request for a preliminary injunction, concluding that the challenged provisions "unconstitutionally impinge on his fundamental right to familial integrity" in a way that "has not been narrowly tailored to serve any State interest." (App. at 78.) It

---

[2] It is not clear from the video of the proceeding—which cuts off during the Parole Board's vote—whether Bleeke's compliance with "proper protocol and procedures" relates to his refusal to admit responsibility for his underlying offense or the standard protocols for maintaining communications with his parole officers. Both were discussed and debated extensively by the Parole Board during the hearing, at far greater length and depth than Bleeke's risk to commit sexual offenses against children.

therefore enjoined the Parole Board from enforcing Conditions 4, 5, 17, and 19 with respect to Bleeke's wife and children, but otherwise left the remaining conditions in place.

Bleeke then filed a motion for summary judgment as to the remainder of his claims. The trial court extended and converted the preliminary injunction into a permanent injunction, enjoining the Parole Board from ever enforcing Conditions 4, 5, 17, and 19 with respect to Bleeke's family, after noting that the Parole Board did not contest that claim in its response to Bleeke's motion for summary judgment. It also limited the enforceability of Condition 4's requirement to report any "inadvertent contact" with children other than his own, in accordance with appellate interpretation of similar provisions, but otherwise denied Bleeke summary judgment on his other claims and instead granted it in favor of the Parole Board. Bleeke appealed.

The Court of Appeals reversed that portion of the trial court's order granting summary judgment in favor of the Parole Board and denying summary judgment to Bleeke. Bleeke v. State, 982 N.E.2d 1040, 1054 (Ind. Ct. App. 2013). It concluded that the statute imposing Condition 5 on Bleeke did not apply as it was enacted after Bleeke committed his underlying offense; that the statute classifying Bleeke as an offender against children was unconstitutionally overbroad as it was applied to Bleeke; that the Parole Board failed to ensure that Bleeke's parole conditions related to protecting children were reasonably related to his successful reintegration into the community as required by statute; and that certain other parole conditions were unconstitutionally vague or overbroad. Id. at 1047–53. It also held that the SOMM program violated Bleeke's Fifth Amendment rights because it forced him to provide potentially incriminating statements at the risk of violating his parole or facing future criminal charges. Id. at 1053–54. We granted transfer and thereby vacate the Court of Appeals opinion, with the exception of those portions we summarily affirm as explained below. Bleeke v. State, 987 N.E.2d 521 (Ind. 2013) (table); Ind. Appellate Rule 58(A).

**Standard of Review**

An appellate court reviews the award or denial of summary judgment through the same lens as a trial court. Haegert v. Univ. of Evansville, 977 N.E.2d 924, 937 (Ind. 2012). Summary judgment is only appropriate when the moving party shows that there are no genuine issues of material fact with respect to a given issue or claim. Id. at 936; Ind. Trial Rule 56(C). The non-moving party then bears the burden of coming forward with evidence designated to show that a genuine issue of material fact does exist. Town of Avon v. W. Cent. Conservancy Dist., 957 N.E.2d 598, 602 (Ind. 2011). All designated evidence and reasonable inferences must be construed in favor of the non-moving party, and doubts resolved against the moving party. Id. But when the facts are undisputed and the question is only one of law, our review is de novo. Id.

**Discussion**

Bleeke's issues on appeal can be summarized into three primary categories. He challenges the specific conditions restricting his access to minors as being unconstitutional, and argues that others fail to comply with certain statutory requirements. He also argues that several of the parole statutes are facially unconstitutional in the manner by which they classify sex offenders. And, finally, he argues that the SOMM program is both facially unconstitutional and unconstitutional as applied to him.

The Parole Board, in a limited cross-appeal, argues that Bleeke has inappropriately named certain defendants in this action, and that regardless, Bleeke has waived all of his

11

arguments.[3] The Parole Board concedes, however, that it no longer seeks to impose the parole conditions in a manner which would restrict Bleeke's relationships with his children and wife. There is therefore no issue before this Court relating to the trial court's order permanently enjoining enforcement of that aspect of those conditions.

## I.    Bleeke's Additional Conditions from Form 49108

The Indiana Code provision governing the conditions of parole for parolees mandates certain conditions be assigned for sex offenders. See Ind. Code § 11-13-3-4(g)(2). It also lays out other conditions that *may* be assigned by the Parole Board. See generally Ind. Code § 11-13-3-4. And the provision also provides that "[t]he parole board may also adopt, under IC 4-22-2, additional conditions to remaining on parole and require a parolee to satisfy one (1) or more of these conditions." Ind. Code § 11-13-3-4(b). However, "[t]hese conditions must be reasonably related to the parolee's successful reintegration into the community and not unduly restrictive of a fundamental right." Ind. Code § 11-13-3-4(b).

### A.  Conditions 4, 5, 8, 12, 17, 19, 20, and 22

Bleeke argues that the additional conditions imposed upon him through State Form 49108 fail one or both of those two statutory requirements—that they are either not reasonably related to his successful reintegration into the community and/or they are unduly restrictive of a

_____

[3] With respect to the portion of the Parole Board's cross-appeal addressing the propriety of the named defendants, we have replaced those individuals who are no longer members of the Indiana Parole Board with the current members. Ind. Trial Rule 25(F). And we agree that the State may not be named as a party-defendant to this action, see Harp v. Ind. Dep't of Highways, 585 N.E.2d 652, 660 (Ind. Ct. App. 1992), but we summarily affirm the Court of Appeals with respect to the Parole Board's waiver claim, Ind. Appellate Rule 58(A)(2).

fundamental right. He specifically notes Conditions 4, 5, 8, 12, 15, 16, 17, 19, 20, and 22 as being such additional conditions.

Conditions 4, 5, 17, 19, and 20, which we have laid out above, are all broadly aimed at restricting Bleeke from being near, communicating with, or associating with, children (and, until the injunction became permanent, from being near, communicating with, or associating with, his own children). Bleeke argues that there is no evidence whatsoever that he poses a risk to any minor, and that these conditions therefore are not reasonably related to his successful reintegration into the community.

We agree with Bleeke. None of the evidence presented at his individualized hearing or designated before the trial court in support of—or in opposition to—his motion for summary judgment indicates that Bleeke is, was, or will be a threat to children—either his own or otherwise. In fact, the evidence uncontrovertibly shows the opposite: that Bleeke is affirmatively *not* a threat to children, nor is he likely to be. The Parole Board's only evidence to the contrary apparently consisted of a general study of cross-over offenders. But we note, as the Court of Appeals did, that the study itself was not made part of the record on appeal. Bleeke, 982 N.E.2d at 1049. This makes it impossible to assess whether the study raises a genuine issue of material fact as to the likelihood of Bleeke himself crossing over from an adult victim to a child victim.[4]

---

[4] But this same study was apparently presented before the federal district court in Bleeke's first litigation, which rejected its applicability to Bleeke as being "far from overwhelming." Bleeke, 2010 WL 299148 at *7. "[E]ven assuming the study was completely reliable, it still leaves a sizeable number of adult sex offenders who would never look to children as targets of repeat misconduct, let alone their own children." Id.

The Parole Board points to Jackson v. State, 816 N.E.2d 868 (Ind. Ct. App. 2004), and argues that similar conditions (assigned as terms of a defendant's probation) were upheld as being reasonably related to the defendant's rehabilitation and protecting the community. We first note that *probation* conditions are a matter of discretion afforded to the trial court, and are conditions assigned—as part of the judiciary's function in setting sentences—in lieu of imprisonment. Griffin v. Wisconsin, 483 U.S. 868, 874 (1987). In that way, probation serves as "simply one point . . . on a continuum of possible punishments," and so probation restrictions "are meant to assure that the probation serves as a period of genuine rehabilitation and that the community is not harmed by the probationer's being at large" because the offender would otherwise be imprisoned and away from the public. Id. at 874–75; Smith v. State, 779 N.E.2d 111, 117 (Ind. Ct. App. 2002) (probation conditions "must be reasonably related to the treatment of the defendant and the protection of public safety"), trans. denied.

Bleeke's conditions of *parole*, however, are a function of the executive (i.e., the Parole Board, in imposing given conditions and probation officers in enforcing them) and the legislature (i.e., the General Assembly's codification of statutes governing what those conditions may be), and *must* be carried out when an offender has completed a shortened portion of an imposed sentence. And under those functions and that statutory structure, additional parole conditions like those at issue here must be "reasonably related to the parolee's successful reintegration into the community and not unduly restrictive of a fundamental right." In other words, considerations of "public safety" or "protecting the community," standing alone, cannot save a parole condition that fails to meet one of the two statutory requirements found in Ind. Code § 11-13-3-4(b). Thus, to the extent the probation conditions in Jackson were reasonably related to public safety and that relation justified their imposition, such analysis is inapplicable here.

Moreover, the defendant in Jackson challenged probation conditions prohibiting contact with persons under the age of eighteen and dating relationships with persons who have minor children—but he was convicted of raping a nineteen-year-old woman in front of her two-year-

14

old son. <u>Jackson</u>, 816 N.E.2d at 871. That the Court of Appeals would affirm those conditions in light of the nature of Jackson's crime is not surprising, as they were tailored towards preventing such a circumstance or environment from arising again. But for that same reason, <u>Jackson</u> is not persuasive here, where Bleeke's conviction was for attempted criminal deviate conduct in which his victim was an adult woman, over the age of twenty-one, and the conduct occurred while the two were alone after meeting in a bar—and Conditions 4, 5, 17, and 19 are unrelated to preventing such a circumstance from recurring. In short, <u>Jackson</u> is inapposite and does not support the Parole Board's position with respect to Bleeke.

Without any evidence of Bleeke posing a threat to children (and in the face of clear evidence to the contrary), Conditions 4, 5, 17, 19, and 20 of Bleeke's parole cannot be viewed as "reasonably related to [Bleeke's] successful reintegration into the community." Ind. Code § 11-13-3-4(b). As he says, the conditions isolate Bleeke from not only minors, but "other, non-immediate family members and . . . friends and acquaintances generally," because "[m]any people have children and most social interactions include children." (Appellant's Br. at 36.) "Parolees are sharply curtailed in their ability to form and maintain friendships with other people, even other adults, when they are restricted from having contact with minors." (Appellant's Br. at 36.) To put it more bluntly, instead of helping Bleeke successfully reintegrate into the community, these conditions—with no reasonable factual basis for doing so—effectively operate only to isolate him further from the community. They thus fail to meet the requirements of Ind. Code § 11-13-3-4(b), and their enforcement must be enjoined.[5][6]

---

[5] Because of this we need not examine Bleeke's claim that the conditions unduly burden his First Amendment right of association. Ind. Code § 11-13-3-4(b) is explicit that both requirements must be satisfied for an additional condition to be valid, although it would certainly seem that a burden on a

With respect to the remaining additional conditions, Bleeke also argues that they were not properly promulgated by the Parole Board pursuant to Indiana Code chapter 4-22-2. See Ind. Code § 11-13-3-4(b) ("parole board may also adopt, under IC 4-22-2, additional conditions"). That chapter of the Indiana Code, he says, requires the Parole Board to publish notice of the proposed parole conditions in the Indiana Register, hold a public hearing, receive and respond to public comments, submit a final version to the Attorney General of Indiana and the Governor of Indiana for approval, and then submit the approved version for publication in the Indiana Administrative Code. He argues that none of his individual additional parole conditions were imposed following this procedure.

In support of this claim, Bleeke argues that none of his additional conditions were individually published in the Indiana Administrative Code, nor are there records of their publication in the Indiana Register. But he acknowledges a provision of the Administrative Code providing that the Parole Board "may attach special conditions to the standard parole release agreement, compliance with which shall be a condition to remaining on parole." 220 Ind.

---

fundamental right, caused by a condition of parole, might be considered "undue" when it is not reasonably related to the parolee's reintegration into society.

[6] Bleeke does not argue that the remaining additional conditions—Conditions 8, 12, 15, 16, and 22—are not reasonably related to his successful reintegration into the community or unduly restrict a fundamental right. Nor do we think such a claim would have merit.

These remaining conditions restrict Bleeke's access to pornography and other sexual material (Condition 8), to bars (Condition 12), and to "areas where potential victims can be encountered" (Condition 15); prohibit him from picking up hitchhikers or traveling alone after dark (Condition 16); and compel him to undertake polygraphs to ensure he is complying with his parole conditions (Condition 22). (App. at 159–60.) Given the facts underlying Bleeke's conviction—picking up a woman in a bar and, after she was intoxicated, traveling to her home and sexually assaulting her—these conditions appear reasonably related to preventing him from returning to such an environment or circumstances, and therefore seem to be reasonably related to his successful reintegration into the community and not unduly restrictive of a fundamental right.

16

Admin. Code 1.1-2-4(b) (Supp. 2011). That same provision provides examples of such special conditions, but notes that the special conditions are not limited to those examples. Id. Bleeke contends that this rule—which he does not challenge as improperly promulgated—is proof that the Parole Board believes it may impose additional conditions without complying with Indiana Code chapter 4-22-2.

But we disagree with his apparent view that such procedure is necessary with each and every additional parole condition adopted by the Parole Board for each and every offender. And to the extent additional conditions may only be adopted "under IC 4-22-2," we think 220 Ind. Admin. Code 1.1-2-4 is an adequate demonstration of compliance.

As the Parole Board says, Bleeke's approach would be a practical impossibility. "A special condition could include a curfew, which would be different for every offender depending upon crime, housing, employment, and any number of other variables. A special condition could be intensely personal, such as living at a certain shelter or address or a curfew or attending certain meetings." (Appellee's Br. at 17.) "To promulgate all would lead to nothing but confusion and the proliferation of administrative rules." (Appellee's Br. at 17.) We hardly think the General Assembly's intent, in including the phrase "under IC 4-22-2" in Ind. Code § 11-13-3-4(b) was to turn the Indiana Administrative Code into an encyclopedia of parole conditions each specifically tailored to individual parolees. The administrative cost of such individual rule promulgation would be extraordinary, to say nothing of the time it would take for each individual condition to be approved and published—indeed, Bleeke's approach might very well mean that

offenders rarely saw parole at all because their parole conditions could not be properly promulgated and published fast enough.[7]

Finally, Bleeke argues that Ind. Code § 11-13-3-4(b) required the Parole Board to conduct "an individualized determination of appropriateness before imposing additional conditions on a parolee." (Appellant's Br. at 29.) Notwithstanding the federal district court's decision that such a hearing was necessary with respect to imposing conditions restricting Bleeke's access to his own family and children (and restricting a specific constitutionally guaranteed liberty interest no longer at issue in this case), our resolution of the remainder of Bleeke's claims about his additional parole conditions means we do not need to resolve this claim. The text of the statute itself directs no such individualized assessment; if one is compelled, it is by virtue of constitutional protections that do not need to be invoked today.

We note, however, that judicial review of the appropriateness of a parolee's specific conditions is very fact-sensitive. And we were able to resolve Bleeke's case here in large part because there *had* been such an individualized hearing with individualized evidence presented, so we had the benefit of a developed record on appeal and could therefore make a determination as to whether Bleeke's conditions complied with the statutory requirements. Certainly the Parole Board, by virtue of having control over offenders about to be released to parole, may be fully capable of developing individualized assessments for each parolee prior to imposing any parole conditions. And it may be more efficient, long-term, for such determinations to be made up front

---

[7] Bleeke similarly asserts that the Parole Board's policy of imposing all sex offender parole conditions on every sex offender, regardless of circumstances, is also an unpromulgated rule and therefore void. But he did not present this claim to the trial court in either his complaint or his motion for summary judgment, and "a claim is not normally available for review on appeal unless first made at trial." Kincaid v. State, 837 N.E.2d 1008, 1010 (Ind. 2005). We thus decline to address it.

18

rather than waiting for them to be judicially ordered as a consequence of a legal challenge. But until the question of whether such assessments are constitutionally compelled is squarely before us, we leave that procedural determination to the Parole Board and the legislature.

### B. Conditions 8, 15, 17, and 19

Bleeke also argues that Conditions 15, 17, and 19 are unconstitutionally vague, and that Condition 8 is impermissibly overbroad.[8] He says those conditions "are not sufficiently clear to inform [him] of what conduct will result in his being returned to prison," and therefore "they violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution." (Appellant's Br. at 40.)

The Court of Appeals agreed, basing its conclusion largely on comparison of Bleeke's parole conditions with identical, or nearly identical, language previously found to be unconstitutionally overbroad or vague in other cases. Bleeke, 982 N.E.2d at 1051–53 (citing

---

[8] Condition 8 restricts Bleeke's access to pornography and certain other sexual material and sex-related businesses, and provides that he

> shall not possess or view any material that is obscene, which for the purposes of this stipulation, is what the average person, applying contemporary community standards, finds that the dominant theme of the material, taken as a whole, appeals to a morbid, degrading, and unhealthy interest in sex; depicts or describes, in a patently offensive way, sexual conduct; and taken and [sic] a whole, lacks serious literary, artistic, political, or scientific value. You shall not visit strip joints, adult bookstores, peep shows, bars where topless or exotic dancers perform, or businesses which sell sexual devices or aids. You shall not possess personal contact materials *(for example, magazines, or papers)* that contain information about persons who are desiring to have personal relationships of any kind with others, nor will you place any ads that are sexual in content or respond by computer, telephone, or internet web sites, to any sexually solicitous ads.

(App. at 159.)

19

Collins v. State, 911 N.E.2d 700 (Ind. Ct. App. 2009), trans. denied and McVey v. State, 863 N.E.2d 434 (Ind. Ct. App. 2007), trans. denied). We see no need to duplicate its analysis as to these conditions, and therefore summarily affirm that portion of the Court of Appeals opinion. Ind. Appellate Rule 58(A)(2). Without further clarification or specificity as to what conduct would result in his return to prison for violating them in accordance with the Court of Appeals decision below, Bleeke's parole conditions 8, 15, 17, and 19 are impermissible.[9]

## II. Ind. Code §§ 11-13-3-4(g); 35-42-4-11

Bleeke was convicted of attempted criminal deviate conduct. Under the current version of the Indiana Code, that classifies him as a "sexually violent predator." See Ind. Code § 35-38-1-7.5(b)(1)(B), (b)(1)(J) (Supp. 2013). This classification means that he is also, by current statute, classified as an "offender against children." Ind. Code § 35-42-4-11(a)(1) (Supp. 2013). Offenders against children may not reside within one thousand feet of a school, youth program center, or public park. Ind. Code § 35-42-4-11(c) (2008). Knowingly or intentionally doing so is a class D felony. Id.

In a similar way, Ind. Code § 11-13-3-4(g)(2) requires the Parole Board to prohibit all sex offenders from residing within one thousand feet of school property and "from owning, operating, managing, being employed by, or volunteering at any attraction designed to be primarily enjoyed by children less than sixteen (16) years of age." Ind. Code § 11-13-3-4(g)(2)(B), (g)(2)(D). A sex offender may obtain written approval from the Parole Board to live

---

[9] And, as we already explained, Conditions 17 and 19 are also inappropriate as not being reasonably related to Bleeke's reintegration into the community.

within one thousand feet of a school, but there is no such waiver available for the employment restriction—and it is not clear if the waiver on residency in proximity of a school would excuse the parolee from criminal liability under the "offender against children" statute.

Bleeke challenges Ind. Code §§ 35-42-4-11 and 11-13-3-4 as being facially unconstitutional because they "impose severe stigma and severe restrictions on liberty onto persons to whom the label [offender against children] does not apply and for whom the restrictions are not reasonably necessary." (Appellant's Br. at 47.) He acknowledges that in some instances the statutes might be properly applied, but argues that the State "cannot constitutionally label a person 'an offender against children' if he has not committed an offense against a child," and cannot impose the restrictions that flow from such a label "on a parolee who has not been convicted of an offense against a minor without first determining through due process that such a person poses an increased risk to minors." (Appellant's Br. at 45–46.) He nevertheless challenges the statutes on their face, rather than as-applied to him, because the operative language used "is automatic and mandatory." (Appellant's Br. at 46.)

The Court of Appeals concluded that Ind. Code § 35-42-4-11 does not apply to Bleeke at all, as it does not apply to offenders who committed crimes prior to June 30, 2006, and Bleeke's offense occurred in 2002.[10] Bleeke, 982 N.E.2d at 1047. It also concluded that Ind. Code § 11-

---

[10] The trial court noted that the statute did not apply to Bleeke—and the Parole Board conceded as much—but it nevertheless declined to invalidate the accompanying parole condition restricting Bleeke from living within one thousand feet of a school. In maintaining the condition, it appears to have relied upon this Court's opinion in Hevner v. State, 919 N.E.2d 109 (Ind. 2009). But in that case, we invalidated application of the residency restriction found in Ind. Code § 35-42-4-11 but nevertheless upheld a *probation* condition prohibiting the defendant from residing within one thousand feet of a school, because the defendant had been convicted of possession of child pornography and therefore was still "subject to conditions of probation that 'have a reasonable relationship to the treatment of the accused and the protection of the public'" Hevner, 919 N.E.2d at 113 (quoting Hale v. State, 888 N.E.2d 314, 319

13-3-4(g)(2)(D), by effectively identifying Bleeke as an offender against children, "limit[ed] legitimate conduct in the form of both foreseeable employment and association," in spite of all the evidence indicating "that Bleeke is not among those sex offenders who 'cross-over' and become a danger to children." Id. at 1050. It therefore found that statutory provision overbroad as applied to Bleeke. Id.

The Court of Appeals also noted that the application of the label "offender against children" implicated a liberty interest in freedom from stigmatization that required some level of due process before it could be imposed. Id. at 1048–49. But it concluded that Bleeke had received that process by way of his litigation leading up to this appeal—it did not require, as Bleeke seeks, an individualized assessment *prior* to the application of the statutes. Id. at 1049.

We agree with the Court of Appeals' analysis on these claims, and we likewise agree that to the extent Bleeke was entitled to procedural protections he received them by way of his legal challenges. We note again that it may prove to be more efficient for the Parole Board to provide such process *before* litigation ensues, but that is not a question we need to resolve today. We

---

(Ind. Ct. App. 2008), trans. denied). Because of the nature of his offense, we could not conclude that "prohibiting Hevner from residing within 1,000 feet of school property [was] an unreasonable condition." Id.

But Hevner does not stand for a blanket proposition that such a residency restriction is always appropriate regardless of whether Ind. Code § 35-42-4-11 applies to a given offender. For parolees not subject to the statute's mandatory application, such a restriction would be an additional parole condition—and the test for appropriateness is whether the residency restriction reasonably relates to the parolees' successful reintegration into the community and is not unduly restrictive of a fundamental right. For the same reasons we explained above with respect to the additional parole conditions restricting Bleeke's interaction with minors, a residency restriction—assigned as an additional parole condition—prohibiting him from living within one thousand feet of a school would also fail that statutory standard.

therefore summarily affirm the Court of Appeals with respect to that portion of its opinion addressing Ind. Code §§ 35-42-4-11 and 11-13-3-4(g).  Ind. Appellate Rule 58(A)(2).

### III.    The SOMM Program

Indiana's SOMM program was established in 1999 as a statewide program aimed at reducing the recidivism of offenders convicted of sex crimes.  It is managed by the DOC with the provision of specialized treatment services subcontracted to Liberty Behavioral Health Corporation.  Offenders are targeted for the SOMM program based on their conviction for certain specified sex-related offenses, or certain other offenses "that [are] determined to be of a sexual nature based upon a review of the instant offense and all available documentation."[11] (App. at 280.)

The program has three phases.  The first phase is a mandatory consent and assessment phase that occurs while a targeted offender is incarcerated—typically upon entry into the prison system.  All targeted SOMM offenders are informed of the nature of the program, including its potential benefits and "possible adverse consequences of participating."    (App. at 266.) Participation requires consent from the offender, but refusal to participate (or a subsequent

---

[11] SOMM target offenses include rape, criminal deviate conduct, child molestation, child exploitation, possession of child pornography, vicarious sexual gratification, child solicitation, child seduction, sexual battery, sexual misconduct with a minor, incest, public indecency, voyeurism, promoting prostitution with a minor, dissemination of matter harmful to minors, failure to register as a sex offender, attempt to commit any of the above, conspiracy to commit any of the above, and aiding, inducing, or causing another person to commit any of the above.  The list of additional offenses that might otherwise identify a SOMM offender, if of a sexual nature, include battery, criminal confinement, residential entry, promoting prostitution, public nudity, stalking, and abuse of a corpse.

withdrawal of consent) is a violation of the DOC's disciplinary code for "[r]efusing to work or accept a work, program or housing assignment." (App. at 260, 266.) Offenders who consent are assessed and evaluated for their recidivism risk, treatment needs, and other issues that would impact their participation in the program.

The offenders are then transitioned to the second phase of the SOMM program, in which they participate (during the last three years of their sentence) in a treatment program based on their recidivism risk. The programs are either risk-based, sex offender-specific, or based on psychoeducational needs. Reports on the offender's participation (and success) in the second phase of the SOMM program are forwarded to treatment providers when the offender is transitioned to parole and begins the third phase. An offender who is suspended from treatment because of counter-therapeutic behavior or violating their treatment agreement will be subject to DOC disciplinary procedures.

The third phase of the SOMM program "is designed to support and optimize the process of re-entry into the community for INSOMM offenders." (App. at 269.) It is available for parolees, but not probationers. During this phase, the program develops a "containment team" for each offender consisting of at least the offender's parole agent, a district coordinator, a treatment provider, and a polygraph examiner. This team shares information in order to assist in management of the parolee. The parolee is also subject to "intensive Sex Offender Parole Stipulations," which are laid out in Form 49108 and are automatically imposed on every SOMM parolee. Failure to complete this phase by being unsuccessfully terminated from the program or suspended from treatment means the parolee is subject to a violation of his or her parole. Parolees can be released from the SOMM program by either successful completion of the required treatment program or the expiration of their parole period before treatment could be completed.

24

As we explained above, Bleeke was convicted of a SOMM target offense, participated in the first two phases of the program, and is now in the third phase. During the second phase—in his community transition program—Bleeke was subject to the conditions of Form 49108 and spent a weekend in jail for refusing to sign a waiver of immunity before undergoing an instant offense polygraph. And as part of the third phase, he is still required to undergo polygraph testing regarding his underlying conviction and sexual history, the results of which might be shared with law enforcement agencies without immunity. And failure to do so is a parole violation.

Bleeke contends that the requirement that he admit his guilt for the offense of which he was convicted in order to successfully complete the SOMM program—even though he has consistently maintained his innocence—coupled with failure to complete the program being a parole violation, is a violation of the Fifth Amendment's privilege against self-incrimination.[12] He also argues that the requirement that he disclose all other sexual behaviors, including those that would be criminal offenses, under a mandatory polygraph program and with no immunity for the disclosures, is a Fifth Amendment violation because failure to comply is grounds to revoke his parole and compliance risks incriminating statements being shared with law enforcement. We disagree.

---

[12] Bleeke states that the program "violates the Indiana and United States Constitutions," but provides no further argument or analysis of the Indiana Constitution's provisions. (Appellant's Br. at 47.) We therefore treat this question as only raising challenges based on the federal provisions.

But for the same reasons that we conclude below that the SOMM program does not "compel" Bleeke to make self-incriminating statements in violation of the Fifth Amendment, we do not need to address his claim that his speech is "compelled" in violation of the First Amendment.

The Fifth Amendment's Self-Incrimination Clause provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. This protection extends to state cases by virtue of the Fourteenth Amendment. See Withrow v. Williams, 507 U.S. 680, 688–89 (1993). "[T]his prohibition not only permits a person to refuse to testify against himself at a criminal trial . . . but also 'privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings.'" Minnesota v. Murphy, 465 U.S. 420, 426 (1984) (quoting Lefkowitz v. Turley, 414 U.S. 70, 77 (1973)); see also Clifft v. Ind. Dep't. of State Revenue, 660 N.E.2d 310, 314 (Ind. 1995) (Fifth Amendment privilege applies "in any proceeding, civil or criminal, administrative or judicial, investigatory or adjudicatory" (quoting Maness v. Meyers, 419 U.S. 449, 464 (1975)). But "[t]he Fifth Amendment prohibits only compelled testimony that is incriminating." Hiibel v. Sixth Judicial Dist. Ct. of Nev., 542 U.S. 177, 190 (2004). If those two elements are present,

> a witness protected by the privilege may rightfully refuse to answer unless and until he is protected at least against the use of his compelled answers and evidence derived therefrom in any subsequent criminal case in which he is a defendant. Absent such protection, if he is nevertheless compelled to answer his answers are inadmissible against him in a later criminal prosecution.

Turley, 414 U.S. at 78 (internal citations omitted).

We therefore must examine whether Bleeke was (or is) compelled to provide self-incriminating testimony because of the SOMM program requirements that he admit his guilt to the underlying conviction and answer questions about his prior sexual history. If so, he must either be afforded use and derivative use immunity for the testimony, or his responses will be inadmissible in any later criminal prosecutions.

## A. Was Bleeke at Risk of Self-Incrimination?

It seems clear that the potential for self-incrimination is present. For this element, there must be "reasonable cause to apprehend danger from a direct answer." Hoffman v. United States, 341 U.S 479, 486 (1951). "The witness is not exonerated from answering merely because he declares that in so doing he would incriminate himself—his say-so does not of itself establish the hazard of incrimination. It is for the court to say whether his silence is justified." Id. But this does not mean the witness must actually provide the self-incriminating testimony in order to prove the privilege; this would effectively defeat the privilege in order be afforded its protection. Id. "To sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result." Id. at 486–87. Answers are incriminating not only when they "would in themselves support a conviction," but also when they would "furnish a link in the chain of evidence" necessary to prosecute the claimant for a crime. Id. at 486.

Bleeke testified at his trial in 2005, and denied any sexual contact with the victim. Though the five-year statute of limitations on perjury has since run, see Ind. Code § 35-41-4-2(a)(1) (Supp. 2013), a charge for that crime was a very real threat when he was required to submit to an instant offense polygraph in October 2008 after continuing to deny his guilt.[13]

---

[13] It is a class D felony to either make "a false, material statement under oath or affirmation, knowing the statement to be false or not believing it to be true," or knowingly make "two (2) or more material statements, in a proceeding before a court or grand jury, which are inconsistent to the degree that one (1) of them is necessarily false." Ind. Code § 35-44.1-2-1 (Supp. 2013).

27

Moreover, he correctly points out that the statutes of limitations on other crimes that may be discovered as a result of the sexual history questions run much longer. See Ind. Code § 35-41-4-2 (no statute of limitations on class A felony prosecutions or murder prosecutions; prosecutions for sex crimes against children not barred until victim reaches age of thirty-one).

The Parole Board asserts that there is no evidence that any such statements might be used in a future criminal proceeding, and that "[n]o such statement has been used in a past criminal proceeding, or even turned over to law enforcement or any other state agency." (Appellee's Br. at 20.) It also cites Chavez v. Martinez, 538 U.S. 760, 766 (2003), for the idea that a Fifth Amendment violation can only occur once the incriminating statement is used against the defendant in a criminal trial—and therefore, the Parole Board says, Bleeke's "attempt to challenge SOMM on self-incrimination grounds is not ripe." (Appellee's Br. at 20.)

The Parole Board misreads Chavez and the limited context in which it was decided. Chavez was a case in which a defendant, while in the hospital for wounds sustained during an altercation with police, was interrogated by police without receiving Miranda warnings. Chavez, 538 U.S. at 763–64. During the course of that interrogation he made several incriminating statements. He was never charged with a crime, though, and the statements were never used against him. But he nevertheless filed a civil suit against the police, claiming a Fifth Amendment violation and seeking damages for that violation under 42 U.S.C. § 1983. The Supreme Court's analysis of when a violation of his rights occurred was thus made in response to whether he had an actionable claim for damages under § 1983—and the Court found that he did not because ultimately he had not suffered actual harm by being asked incriminating questions before he was Mirandized. Id. at 766–67.

Taking this analysis out of that context and applying it as the rule for when a defendant may properly invoke the Fifth Amendment's privilege, as the Parole Board seeks to do, would have far greater (and worse) implications. In fact, it would effectively vitiate the Fifth

Amendment privilege entirely because a defendant could not claim the *protection* of the Fifth Amendment—only, later, a *violation* of the Fifth Amendment. He or she could not refuse to answer a question because the response would be self-incriminating; a defendant could only later seek to have that response excluded in Court and a violation would only occur if the trial court refused that request.

This is contrary to the greater wealth of U.S. Supreme Court case law on the subject. See, e.g., Turley, 414 U.S. at 77 (Fifth Amendment privileges witness "not to answer official questions . . . where the answers might incriminate him in future criminal proceedings"); see also Counselman v. Hitchcock, 142 U.S. 547, 562 (1892) ("It is impossible that the meaning of the constitutional provision can only be that a person shall not be compelled to be a witness against himself in a criminal prosecution against himself." Instead, "[t]he object was to insure that a person should not be compelled, when acting as a witness in any investigation, to give testimony which might tend to show that he himself had committed a crime."), overruled in part by Kastigar v. United States, 406 U.S. 441 (1972). The Court in Chavez was explaining that Chavez could not seek a damages claim under § 1983 for a Fifth Amendment violation because his incriminating statements were not actually used against him at trial; it was neither faced with, nor addressed, the propriety of whether Chavez could have invoked the Fifth Amendment and refused to answer the officer's questions in the hospital. And it is this latter context in which we find ourselves today.

Moreover, it is irrelevant to our analysis that the Parole Board asserts that no one has been subject to prosecution for admissions made during the SOMM program. The record before us indicates that such an occurrence is squarely within the scope and contemplation of the program. For example, the polygraph waiver expressly states that the results could be shared with agencies other than the parolee's treatment team, and that the examiner was obliged to comply with any state or federal statutory reporting requirements. See, e.g., Ind. Code chapter 31-33-5 (mandatory reporting requirements for victims of child abuse or neglect). And it is hard

29

to imagine that the State would decline to prosecute if a SOMM sexual history examination disclosed a severe and unsolved crime.  See Murphy, 465 U.S. at 422–24.

Put simply, the SOMM program is primarily aimed at treatment, but also has a degree of investigatory intent.  The fact that no such follow-on prosecutions has yet occurred does not change our view "from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result."  Hoffman, 341 U.S. at 486–87.

## B.  Were Bleeke's Responses Compelled?

This is not to say that a State official or agent may not ask Bleeke questions that risk his self-incrimination.  To the contrary, that is precisely what is required of those charged with public safety.

> The duty to give testimony was qualified at common law by the privilege against self-incrimination.  And the Fifth Amendment has embodied this privilege in our fundamental law.  But the privilege is a privilege to withhold answers and not a privilege to limit the range of public inquiry.  The Constitution does not forbid the asking of criminative questions.  It provides only that a witness cannot be compelled to answer such questions unless 'a full substitute' for the constitutional privilege is given.

United States v. Monia, 317 U.S. 424, 432–33 (1943).  The general rule is therefore "that a witness confronted with questions that the government should reasonably expect to elicit incriminating evidence ordinarily must assert the privilege rather than answer if he desires not to incriminate himself."  Murphy, 465 U.S. at 429.  "But if he chooses to answer, his choice is considered to be voluntary since he was free to claim the privilege and would suffer no penalty as a result of his decision to do so."  Id.

30

There are exceptions to this general rule, however, including "where the assertion of the privilege is penalized so as to 'foreclos[e] a free choice to remain silent, and . . . compe[l] . . . incriminating testimony.'" Id. at 434 (quoting Garner v. United States, 424 U.S. 648, 661 (1976)) (alterations in original). "If a witness . . . answers a question that both he and the government should reasonably expect to incriminate him, the Court need ask only whether the particular disclosure was 'compelled' within the meaning of the Fifth Amendment." Murphy, 465 U.S. at 428. "[W]hen a State compels testimony by threatening to inflict potent sanctions unless the constitutional privilege is surrendered, that testimony is obtained in violation of the Fifth Amendment." Lefkowitz v. Cunningham, 431 U.S. 801, 805 (1977).

Here, Bleeke initially refused to sign the polygraph form consenting to a waiver of confidentiality (and acknowledging a lack of immunity) for his results, but still offered to take the exam. This garnered him a weekend in jail for violating a rule of his community transition program. He then acquiesced to signing the form rather than go back to jail again and took the polygraph. And he now faces an ongoing threat of this same sanction through the conditions of his parole.

The question before us thus becomes whether this threat to Bleeke—answer the potentially incriminating questions or face re-incarceration—so compelled (or will compel) his answers that it violates the Fifth Amendment unless he is provided immunity.

1.  *The SOMM Program's Second Phase*

The U.S. Supreme Court recently decided McKune v. Lile, 536 U.S. 24 (2002), a case involving an inmate in a state prison in Kansas participating in an in-prison treatment program very similar to the SOMM program. As part of that program, the participants were required to accept responsibility for the crime for which they were sentenced and complete a full sexual history, regardless of whether their prior sexual activities might or might not constitute

31

uncharged crimes. The information disclosed was not privileged; the possibility existed that Kansas could use the information as the basis for new criminal charges, and—similar to Indiana—Kansas law required the reporting of sexual offenses against minors to law enforcement. "Although there is no evidence that incriminating evidence has ever been disclosed under the [program], the release of information is a possibility." Id. at 30.

Robert Lile was in jail for rape, aggravated sodomy, and aggravated kidnapping, and was ordered to enter the treatment program when several years remained on his sentence. If he refused to participate, his privileges would be reduced, including "visitation rights, earnings, work opportunities, ability to send money to family, canteen expenditures, access to a personal television, and other privileges." Id. at 30. He would also be transferred to a higher-security unit, be in a more dangerous environment, and would move from a two-person cell to a four-person cell. Lile refused to participate, claiming that the disclosures violated his Fifth Amendment privilege against self-incrimination (he had maintained at trial that the intercourse was consensual), and filed a § 1983 action seeking to enjoin the loss of his privileges and transfer to a different housing unit. The Supreme Court's opinion was fractured with respect to how to analyze Lile's claim, but five Justices nevertheless concurred that Lile's responses were not "compelled" in violation of the Fifth Amendment.

Justice Kennedy, writing for four Justices, noted that "[w]hen convicted sex offenders reenter society, they are much more likely than any other type of offender to be rearrested for a new rape or sexual assault."[14] Id. at 33. "States thus have a vital interest in rehabilitating

_____

[14] This statement, while true, should not be taken to mean that sex offenders reentering society are more likely than other offenders to be recidivists—it means that if the sex offender *does* commit another offense, he or she is more likely to commit another sex offense than a released offender convicted of another crime. A study by the Bureau of Justice Statistics—a component of the U.S. Department of

convicted sex offenders," and clinical rehabilitative programs can be useful in "enabl[ing] sex offenders to manage their impulses and in this way reduce recidivism." Id. And "[a]n important component of those rehabilitation programs requires participants to confront their past and accept responsibility for their misconduct" because "[d]enial is generally regarded as a main impediment to successful therapy." Id.

---

Justice—released in 2002 tracked the recidivism of nearly 300,000 inmates released from incarceration in 1994. "Recidivism of Prisoners Released in 1994," Bureau of Justice Statistics (June 2002), *available at http://www.bjs.gov/content/pub/pdf/rpr94.pdf*. Of the prisoners tracked, 2.5% of released rapists were arrested for another rape within three years—a percentage higher than any other class of offender re-arrested for rape. Id. at 1, 9. But those incarcerated for rape and other sexual assaults were among the lowest total re-arrest rates for any crime; the highest actual percentage of re-arrests was found among offenders convicted of robbery and other property crimes. Id. at 1. For example, 23% of those originally convicted of burglary were re-arrested within three years for another burglary; and nearly 34% of those arrested for larceny/theft were re-arrested for the same offense within three years. Id. at 9.

A number of factors can, of course, contribute to this lower relative rate of recidivism amongst released sex offenders, including the possibly higher percentage of sexual offenses that go unreported or uncharged and (significantly) the impact of programs like the Kansas program and the SOMM program. For example, a similar study by the Bureau of Justice Statistics that tracked the re-arrest rates of offenders released in 1983, showed that the percentage of released rapists who were re-arrested within three years for rape was more than twice as high (7.7%) as it was a decade later. "Recidivism of Prisoners Released in 1983" at 6, Bureau of Justice Statistics (April 1989), *available at http://www.bjs.gov/content/pub/pdf/rpr83.pdf*. But while that made rapists more likely than other offenders to be re-arrested for rape, the highest percentages of offenders re-arrested for the same offense as their original conviction remained amongst those convicted of property and theft offenses. See id. at 6 (31.9% rate for burglary; 33.5% rate for larceny/theft).

The bottom line is that rehabilitation programs like the Kansas program and the SOMM program have value not because sex offenders on parole or probation are inherently more likely to re-offend than any other class of parolee or probationer—they are not. But they *are* more likely, if they do re-offend, to re-offend by committing another sex offense (as compared to any other class of parolee or probationer). And given the particularly heinous nature of these offenses—and their lasting consequences on victims who in many cases are some of the most vulnerable—society has assigned a great deal of value in preventing their recurrence.

Justice Kennedy did not find the absence of immunity protections to automatically invalidate the Kansas program. The lack of immunity served legitimate purposes because part of accepting full responsibility for their actions entailed prisoners "accept[ing] the proposition that those actions carry consequences," and guaranteeing immunity for statements made during the program would effectively "absolve many sex offenders of any and all cost for their earlier crimes. This is the precise opposite of the rehabilitative objective." Id. at 34–35. And Kansas had a valid interest in the deterrent effect of maintaining the option to prosecute an offender for any uncharged offenses that might be uncovered during the course of treatment. Id. at 35.

Certainly if "Kansas offered immunity, the self-incrimination privilege would not be implicated," but because immunity was not offered "the central question becomes whether the State's program, and the consequences for nonparticipation in it, combine to create a compulsion that encumbers the constitutional right." Id. "If there is compulsion, the State cannot continue the program in its present form." Id. And ultimately, Justice Kennedy concluded, the Kansas program "[did] not compel prisoners to incriminate themselves in violation of the Constitution." Id. The consequences imposed for failing to participate—loss of privileges and transfer to a different housing unit—were "not ones that compel a prisoner to speak about his past crimes despite a desire to remain silent." Id. at 36.

And, significantly, the consequences were being imposed on prisoners rather than ordinary citizens. Because even though "[t]he privilege against self-incrimination does not terminate at the jailhouse door," the fact of a valid conviction permits a range of conditions that might infringe upon a free citizen's constitutional rights. Id. And those conditions could be validly imposed in the name of rehabilitation and "the need to grant necessary authority and capacity to federal and state officials to administer the prisons." Id. at 36–37. Justice Kennedy pointed to Sandin v. Conner, 515 U.S. 472, 485 (1995), in which the Court said that "challenged prison conditions cannot give rise to a due process violation unless those conditions constitute

'atypical and significant hardship[s] on [inmates] in relation to the ordinary incidents of prison life,'" id. at 37 (quoting Sandin, 515 U.S. at 484).

Extending that test to a prisoner's claim that he was being compelled to incriminate himself, Justice Kennedy said that "[t]he compulsion inquiry must consider the significant restraints already inherent in prison life and the State's own vital interests in rehabilitation goals and procedures within the prison system." McKune, 536 U.S. at 37. And therefore "[a] prison clinical rehabilitation program," bearing a rational relationship to a legitimate state objective, "does not violate the privilege against self-incrimination if the adverse consequences an inmate faces for not participating are related to the program objectives and do not constitute atypical and significant hardships in relation to the ordinary incidents of prison life." Id. at 37–38.

Under this framework, Justice Kennedy concluded that Lile was not entitled to relief because his decision to not participate did not extend his term of incarceration or affect his eligibility for good-time credits or parole. Id. at 38. Instead it changed his housing assignment, a legitimate consequence because his assignment to the facility where the program was conducted meant someone who *would* participate could *not* be assigned there, and reduced his prison privileges—also a legitimate consequence because "[a]n essential tool of prison administration . . . is the authority to offer inmates various incentives to behave." Id. at 39. And Lile's conviction of a crime took his case out of the realm of the so-called "penalty cases"— because those cases "involved free citizens given the choice between invoking the Fifth Amendment privilege and sustaining their economic livelihood," and those notions do not easily extend to prison life, "where inmates surrender upon incarceration their rights to pursue a

35

livelihood and to contract freely with the State, as well as many other basic freedoms." Id. at 40.[15]

Justice O'Connor concurred in the judgment of the Court, but believed "the proper theory should recognize that it is generally acceptable to impose the risk of punishment, however great, so long as the actual imposition of such punishment is accomplished through a fair criminal process." Id. at 53. She disagreed with the application of the Sandin standard to Fifth Amendment violations, but did not see the need to set forth any test of her own to find that Lile's statements were not unconstitutionally compelled. Id. at 54. Instead she believed that the text of the Fifth Amendment itself provided the framework for analysis: "whether the pressure imposed in such situations rises to a level where it is likely to 'compe[l]' a person 'to be a witness against himself.'" Id. at 49 (quoting U.S. Const. amend. V). And that same analysis applied equally "to penalties imposed upon a person as a result of the failure to incriminate himself—some penalties are so great as to 'compe[l]' such testimony, while others do not rise to that level." Id. But by comparing the penalties Lile faced with those faced in the penalty cases, she found the penalty cases to be far more significant and therefore agreed with the plurality's conclusion that Lile had not been compelled to be a witness against himself. Id. at 49–50.

---

[15] The "penalty cases" were those in which "the State not only compelled an individual to appear and testify, but also sought to induce him to forgo the Fifth Amendment privilege by threatening to impose economic or other sanctions 'capable of forcing the self-incrimination which the Amendment forbids.'" Murphy, 465 U.S. at 434 (quoting Cunningham, 431 U.S. at 806). The rule from those cases was that "a State may not impose substantial penalties because a witness elects to exercise his Fifth Amendment right not to give incriminating testimony against himself." Id. (quoting Cunningham, 431 U.S. at 805); see Cunningham, 431 U.S. at 801 (loss of right to hold public office); Turley, 414 U.S. at 70 (ineligibility to participate in government contracts); Uniformed Sanitation Men Ass'n, Inc. v. Comm'r of Sanitation of City of New York, 392 U.S. 280 (1968) (termination of employment); Spevack v. Klein, 385 U.S. 511 (1967) (loss of professional license).

McKune's application has been mixed in both state and federal courts, with differences arising in whether to apply Justice Kennedy's or Justice O'Connor's approach, and different results as to whether inmates are compelled to violate their Fifth Amendment privilege by virtue of their participation in programs similar to SOMM (i.e., requiring admission of guilt or past crimes, coupled with a threat of lost credit time or other prison privileges).

Most Circuits of the Federal Court of Appeals have rejected these Fifth Amendment challenges.[16] But the Ninth Circuit, by way of example, reached a different conclusion in a case in which the challenge to the sex offender program related to the requirement to admit guilt to other crimes for which a probationer was not convicted, and the probationer's probation had been revoked several times for noncompliance.[17] And similarly, some state courts have found no

---

[16] See, e.g., DeFoy v. McCullough, 301 Fed.Appx. 177, 181–82 (3rd Cir. 2008) (defendant "*chose* not to participate in a valid treatment program in order to avoid potential self-incrimination, and he suffered because of his choice"); Entzi v. Redmann, 485 F.3d 998, 1002 (8th Cir. 2007) (mere filing of petition to revoke probation—before inmate is released from incarceration—because of failure to comply with sex offender program "is not a consequence serious enough to compel him to be a witness against himself in violation of the Fifth Amendment" and, also, petition was denied by state court); Ainsworth v. Stanley, 317 F.3d 1, 6 (1st Cir. 2002) (adopting Justice O'Connor's approach and reaffirming prior decisions that "the reduced likelihood of parole for refusing to participate in the [sex offender program] does not constitute a penalty sufficient to compel incriminating speech in violation of the Fifth Amendment"); Searcy v. Simmons, 299 F.3d 1220, 1226 (10th Cir. 2002) (adopting Justice O'Connor's approach and finding that "foreclosing [the inmate] from the mere *opportunity* to earn good time credits is not a new penalty, but only the withholding of a benefit . . . [Kansas] is under no obligation to give").

[17] See United States v. Antelope, 395 F.3d 1128, 1137–38 (9th Cir. 2005) ("The irreconcilable constitutional problem . . . is that even though the disclosures sought here may serve a valid rehabilitative purpose, they also may be starkly incriminating, and there is no disputing that the government may seek to use such disclosures for prosecutorial purposes.").

constitutional flaw in these programs,[18] while others have found such programs to violate the Fifth Amendment.[19]

Bleeke claims that "[i]f he refuses to participate while in prison he will be cited for a disciplinary violation and will lose statutory credit time on his sentence." (Appellant's Br. at 47.) "Deducting credit time from an inmate's incarceration because he refuses to admit sexual offenses [in] Phase II of the SOMM program surely . . . rises to the level of compulsion for purposes of the Fifth Amendment privilege against self-incrimination." (Appellant's Br. at 50.)

---

[18] See, e.g., State v. Iowa Dist. Ct. for Webster Cnty., 801 N.W.2d 513, 528 (Iowa 2011) (applying Justice O'Connor's approach and concluding that "[t]he State is not using a threatened loss of credits to try to extract testimony; instead, it is attempting to administer a bona fide rehabilitation program for sex offenders who have already been found guilty under a statutory scheme that afforded them all required due process."), r'hing denied; Spencer v. State, 334 S.W.3d 559, 563–68 (Mo. Ct. App. 2010) (applying Justice Kennedy's approach and concluding that extending conditional release date to maximum prison term and denial of good-time credits for refusal to participate in sex offender program do not constitute atypical or significant hardships in relation to ordinary incidents of prison life), trans. denied; Dzul v. State, 56 P.3d 875, 884–85 (Nev. 2002) (probation a form of leniency and defendant not penalized for refusing to admit guilt to underlying offense during treatment—instead defendant was not given benefit extended to those who accept responsibility for their wrongs); State v. Pritchett, 69 P.3d 1278, 1287 (Utah 2003) (no Fifth Amendment violation because probation statute "grants a privilege to which the convicted child sex offender has no automatic right—placement in a resident treatment facility—in exchange for the offender choosing to admit culpability" or "the offender can choose to serve out the mandatory term to which he has been lawfully convicted").

[19] See, e.g., Johnson v. Fabian et al., 735 N.W.2d 295 (Minn. 2007) (applying Justice Kennedy's approach and finding that extending supervised release date constituted compulsion); State v. Fuller, 915 P.2d 809, 813–16 (Mont. 1996) (trial court's threat to revoke suspended sentence for sex offense if defendant failed to comply with treatment program, including requirement to disclose sexual history, threatened "a real and significant punishment"); Bender v. N.J. Dep't of Corr., 812 A.2d 1154 (N.J. Super. Ct. App. Div. 2003) (reading McKune to prohibit penalties creating lengthier incarceration, regardless of applying Sandin test or Justice O'Connor's framework); State ex rel. Tate v. Schwarz, 654 N.W.2d 438 (Wis. 2002) (State conceded that requiring inmate to admit guilt for offense of conviction while appeal was pending constituted compulsion).

This reads as a facial challenge to the SOMM program, but it also includes a specific challenge regarding its application to Bleeke in that the State actually used—and carried out—the threat of re-incarceration as leverage to require Bleeke to provide potentially incriminating statements during the second phase of the SOMM program. Regardless, we agree with those other state and federal courts applying McKune and holding that this form of disciplinary response does not constitute a "penalty" such that Bleeke would have been compelled to yield his Fifth Amendment privilege. In doing so, we need not choose between Justice Kennedy's approach in McKune or Justice O'Connor's, as we find Bleeke's claim fails under both.

We begin by noting that Indiana's credit time assignments, and the grounds for reduction or deprivation, are established by statute. See Ind. Code §§ 35-50-6-4 (Supp. 2013) (credit time assignments and grounds for reassignment), -5 (Supp. 2013) (grounds for deprivation of earned time). And we have long said that these statutes "encourage inmates of penal institutes to behave well while confined, improve their morale and thus help the prison authorities to maintain order and control." Dunn v. Jenkins, 268 Ind. 478, 485, 377 N.E.2d 868, 873 (1978). Cf. McKune, 536 U.S. at 39 ("An essential tool of prison administration . . . is the authority to offer inmates various incentives to behave. The Constitution accords prison officials wide latitude to bestow or revoke these perquisites as they see fit.") (Kennedy, J., plurality opinion).

Such good time credits and classifications, however, are not constitutionally required—and an inmate only acquires a liberty interest in those credits when they are actually awarded. Cottingham v. State, 424 N.E.2d 105, 107 (Ind. 1981). And once that liberty interest attaches, due process requires only certain protections before the good time credits may be revoked. See Hadley v. Buss, 385 Fed.Appx. 600, 603 (7th Cir. 2010) (when inmate's credit time reduced for failure to participate in SOMM, "due process requires only that a prisoner receive written notice of the charges at least 24 hours in advance of the hearing; an opportunity to present testimony and evidence to a neutral decision-maker; and a written explanation supported by some evidence in the record"). These due process requirements are therefore contained in the same statutes.

39

Ind. Code §§ 35-50-6-4(e), -5(b).  And the statutes make clear that an inmate may "be deprived of any part of the credit time the person has earned . . . [i]f the person is a sex offender . . . and refuses to participate in a sex offender treatment program specifically offered to the sex offender by the department of correction" while he or she is incarcerated.  Ind. Code § 35-50-6-5(a)(6) (2008).

Under Justice Kennedy's analysis, losing earned credit time would not be an "atypical and significant hardship[] . . . in relation to the ordinary incidents of prison life."  McKune, 536 U.S. at 38.  To the contrary, this statutory scheme of carrot and stick is simply part and parcel of life as an incarcerated inmate.  Id. at 44 ("States may award good-time credits and early parole for inmates who accept responsibility because silence in these circumstances does not automatically mean the parole board, which considers other factors as well, will deny them parole.").

And when the purpose of the SOMM program is to reduce the recidivism rate of sex offenders who are released back into society, providing prison officials with the option (subject to due process protections) of reducing or revoking credit time for convicted offenders who refuse to fully participate in the program while incarcerated—and thus not returning them back into society as quickly because they are not rehabilitated—is "a sensible approach to reducing the serious danger that repeat sex offenders pose to many innocent persons, most often children." Id. at 48.

The same would result under Justice O'Connor's analysis.  The DOC's decision to assign Bleeke to the SOMM program was based on a "fair criminal process"—his conviction for attempted criminal deviate conduct.  Cf. Webster Cnty., 801 N.W.2d at 527.  And the statute permitting the DOC to revoke Bleeke's credit time, or reassign him to a credit-restricted class, was the law when Bleeke committed his offense and when he was convicted.  So to borrow from the Iowa Supreme Court, "from the moment [Bleeke] committed his crime, it was clear that if he

40

was convicted and chose not to participate in the prescribed treatment program, he would not be eligible for earned-time credits. That was the set of consequences for his conduct prescribed by the legislature." Id.

Moreover, there is no evidence that the DOC or the State is using the second phase of the SOMM program as a fishing expedition to identify other uncharged crimes, or is threatening the loss of credit time purely to compel incriminating testimony. "[I]nstead, it is attempting to administer a bona fide rehabilitation program for sex offenders who have already been found guilty under a statutory scheme that afforded them all required due process." Id. at 528. And even if Bleeke balked at the program and was threatened with a reduction in credit class or the revocation of earned credits, those disciplinary actions could not be accomplished without the additional due process protections spelled out in the Indiana Code.[20] Cf. McKune, 536 U.S. at 53 ("I believe the proper theory should recognize that it is generally acceptable to impose the risk of punishment, however great, so long as the actual imposition of such punishment is accomplished through a fair criminal process.") (O'Connor, J., concurring). And there is no evidence that the second phase of the SOMM program could be applied to extend an offender's period of incarceration beyond that of his original sentence—its only impact would be to reduce the availability of an early release to parole, or limit access to other privileges within the prison system.

---

[20] For the same reasons, we reject Bleeke's claim with respect to how the second phase of the SOMM program was applied to him. Just as there is no automatic, blanket, or unqualified entitlement to early release on parole, favorable credit status, or any other favorable prison privileges, neither did Bleeke have an entitlement to remain in a community transition program when he refused to comply with its rules. See Ind. Code §§ 35-50-6-4 (authorizing reassignment of credit class for violation of community transition program rules), -5 (permitting deprivation of earned credit time for violation of community transition program rules); see also Ind. Code § 11-10-11.5-11.5 (Supp. 2013) (providing for possibility of return to DOC, or DOC disciplinary actions, for violation of community transition program rules).

And so while he was incarcerated, the State was permitted to present Bleeke—and all SOMM inmates—with a constitutionally permissible choice: participate in the SOMM program and maintain a more favorable credit status and/or privileges within the prison system or a favorable assignment in a community transition program, or refuse to participate and instead serve out the full term for which he had been lawfully convicted. Cf. Pritchett, 69 P.3d at 1287. And that choice was Bleeke's, and Bleeke's alone. See McGautha v. California, 402 U.S. 183, 213 (1971) ("Although a defendant may have a right, even of constitutional dimensions, to follow whichever course he chooses, the Constitution does not by that token always forbid requiring him to choose.").

But what Bleeke seeks instead is to have his cake and eat it too, by way of a third option: refuse to participate in a program legitimately aimed at his rehabilitation, but yet still receive the full benefits of a shortened sentence from a favorable credit class and be assigned to a community transition program—and thus re-enter society more quickly, but without the benefits of rehabilitative care. The State is not required to afford such an option to incarcerated inmates.

### 2. The SOMM Program's Third Phase

We next turn to Bleeke's claim that the third phase of the SOMM program—which occurs while the offender is on parole—is also unconstitutional. Our analysis begins with Minnesota v. Murphy, in which the U.S. Supreme Court examined the issue of whether incriminating statements made by a probationer to his probation officer could be admitted into evidence at a subsequent criminal prosecution. 465 U.S. at 422.

Murphy was on probation for false imprisonment (the original charge was criminal sexual conduct), and as part of his probation he was required to participate in a sex offender treatment program and be truthful with his probation officer—failure to comply could result in revocation of his probation. At some point during his probation, Murphy's treatment counselor informed

42

his probation officer that Murphy had admitted to an earlier rape and murder during a treatment session. The probation officer met with Murphy and informed him of the report; she expressed that her primary concern was the relationship between the prior rape and murder and the events leading to his false imprisonment conviction, and its implications on Murphy's treatment program. Murphy admitted guilt for the rape and murder, the probation officer contacted law enforcement, and Murphy was charged for the earlier crimes.

Murphy then sought to suppress his self-incriminatory statements, claiming they were obtained in violation of the Fifth Amendment. The U.S. Supreme Court found that Murphy failed to assert the privilege against self-incrimination in a timely manner and rejected his claim that he was compelled to respond by virtue of the threat of his probation being revoked. Id. at 430–31, 434.

But even though Murphy provided his self-incriminating statements under the threat of his probation being revoked—arguably a penalty—it was the nature of that threat that separated Murphy's case from the penalty cases, despite some superficial similarities. Id. at 435.

> A State may require a probationer to appear and discuss matters that affect his probationary status; such a requirement, without more, does not give rise to a self-executing privilege. The result may be different if the questions put to the probationer, however relevant to his probationary status, call for answers that would incriminate him in a pending or later criminal prosecution. There is thus a substantial basis in our cases for concluding that if the State, either expressly or by implication, asserts that invocation of the privilege would lead to revocation of probation, it would have created the classic penalty situation, the failure to assert the privilege would be excused, and the probationer's answers would be deemed compelled and inadmissible in a criminal prosecution.

Id. It would be a different circumstance, however, "if the questions put to a probationer were relevant to his probationary status and posed no realistic threat of incrimination in a separate

43

criminal proceeding." Id. at 435 n.7. And "a State may validly insist on answers to even incriminating questions and hence sensibly administer its probation system, as long as it recognizes that the required answers may not be used in a criminal proceeding and thus eliminates the threat of incrimination." Id.

Nevertheless, even though Murphy's statements to his probation officer were used in a criminal proceeding, the Supreme Court found no Fifth Amendment violation because Murphy's probation conditions "merely required him to appear and give testimony about matters relevant to his probationary status" and did not "require[] him to choose between making incriminating statements and jeopardizing his conditional liberty by remaining silent." Id. at 436. Murphy was required to meet with his probation officer and tell the truth—and failure to do so could result in his probation being revoked—but that was not sufficient "compulsion." Id. That level of compulsion was "indistinguishable from that felt by any witness who is required to appear and give testimony, and . . . it is insufficient to excuse Murphy's failure to exercise the privilege in a timely manner." Id. at 437.

Moreover, the Court saw no reason for assuming that the state of Minnesota intended "to attach an impermissible penalty to the exercise of the privilege against self-incrimination" because "[t]here is no direct evidence that Murphy confessed because he feared that his probation would be revoked if he remained silent." Id. And even if he possessed such a fear, it would not have been reasonable because "[o]ur decisions have made clear that the State could not constitutionally carry out a threat to revoke probation for the legitimate exercise of the Fifth Amendment privilege." Id. at 438. Instead, "Murphy revealed incriminating information instead of timely asserting his Fifth Amendment privilege," and "his disclosures were not compelled incriminations." Id. at 440. He therefore could not—at that point—invoke the privilege to prevent the statements from being used against him at trial. Id.

44

We next turn to this Court's decision in <u>Gilfillen v. State</u>, 582 N.E.2d 821 (Ind. 1991), in which we confronted the question of whether a probationer's probation was properly revoked when he refused to admit guilt for the underlying offense during court-ordered counseling sessions. Terry Gilfillen had been convicted on several counts of child molestation and incest, and received an aggregate sentence of eight years, with three suspended and two years ordered to probation following his jail term. A condition of the probation was that the defendant receive counseling. A year into his probation, Gilfillen's probation officer received a letter from his counselor saying that Gilfillen was only attending sessions because he was required to under the terms of his probation and to prove his innocence—he was not working on his sexual abuse treatment. Gilfillen was directed to enroll in a different program, but was turned down because he continued to deny having a sexual abuse problem and claimed innocence; the probation officer then filed a notice of probation violation and the trial court revoked Gilfillen's probation.

We reversed, finding that Gilfillen was attending the required sessions and that was all that was required under the trial court's order. <u>Id.</u> at 824. And we noted that

> he did not plead guilty and, therefore, has not admitted to having any child molesting problem. In fact, he continues to protest his innocence. Under these circumstances, requiring Gilfillen to admit that he has a problem with child molesting or face revocation of probation is tantamount to requiring that he admit that he is guilty of the crimes charged. Clearly, this is unacceptable.

<u>Id.</u> We recognized that "probation is a matter of grace," subject to the trial court's discretion, and that reasonable conditions may be placed on a probationer; and we acknowledged that a defendant's continued denial of guilt might render him or her an inappropriate candidate for probation in the first place. <u>Id.</u> But "thought control" is not a reasonable condition of probation,

and "[t]hus, in a circumstance such as this, where the defendant has not pled guilty but was instead convicted while denying guilt, [a] trial court may not insist on an admission of guilt as a condition of probation or use a continued denial of guilt as the basis for revocation." Id.[21]

Bleeke points to <u>Murphy</u> and <u>Gilfillen</u> as standing for the principle that revoking an individual's probation for refusing to answer incriminating questions unrelated to the probation would be impermissible under the Fifth Amendment, and says the same would be true for a parolee required to answer self-incriminating questions under the SOMM program. But while we agree that those cases are informative, we disagree that they control the outcome here.

In <u>Murphy</u> the concern was a probation officer using the threat of incarceration as grounds for compelling the defendant to answer self-incriminating questions that were not relevant to the terms of his probation—but at the same time, the Court did not foreclose the State from revoking probation "for a refusal to answer that violated an express condition of probation." <u>Murphy</u>, 465 U.S. at 435 n.7. And in <u>Gilfillen</u>, the concern was the trial court itself seeking to compel an admission of guilt, as a pre-condition to the exercise its discretion, when the defendant has consistently claimed innocence. In essence, the trial court in <u>Gilfillen</u> was trying to impose its own plea arrangement on the defendant—an exercise of "thought control" that we concluded was an unacceptable abuse of discretion. 582 N.E.2d at 824.

Neither of those issues or contexts is implicated in this case. Here, Bleeke's compliance with the SOMM program and performance of polygraphs is an express condition of his parole

---

[21] We did not specify it in <u>Gilfillen</u>, but in <u>State v. Moore</u>, 909 N.E.2d 1053, 1056 n.1 (Ind. Ct. App. 2009), <u>trans. denied</u>., the Court of Appeals noted that <u>Gilfillen</u>'s rationale was implicitly grounded in the Fifth Amendment.

and is highly relevant to his successful reintegration into society. And this is not a circumstance where a trial court is setting a more lenient sentence for Bleeke, and then threatening to increase that sentence if Bleeke fails to admit his guilt for the underlying offense.

Moreover, Bleeke ignores the difference between probation and parole. Probation, as we said above, is a matter of judicial grace and discretion as a deliberate sentencing alternative to be imposed *in lieu of* incarceration—a probationer is not under the control of the DOC. His or her compliance is controlled by the sentencing court, with enforcement through its own probation officers.

But the DOC and the Parole Board placing an offender on parole is not an action of judicial discretion. "A parole is not a suspension of a sentence." Jenkins v. Madigan, 211 F.2d 904, 906 (7th Cir. 1954). Rather, "[i]t is a substitution during the continuance of the parole, of a lower grade of punishment, by confinement in the legal custody and under the control of the warden within the specified prison bounds outside the prison, for the confinement within the prison adjudged by the court." Id. So "[w]hile a parole is an amelioration of punishment, it is, in legal effect, still imprisonment." Overlade v. Wells, 234 Ind. 436, 446, 127 N.E.2d 686, 691 (1955) (internal citation omitted). "While on parole the prisoner remains in the legal custody of the parole agent and warden of the prison from which he is paroled until the expiration of the maximum term specified in his sentence or until discharged as provided by law." Id. at 446, 127 N.E.2d at 690.

So Bleeke's early release from imprisonment to parole is a matter of executive and legislative grace and clemency. It is a privilege afforded to him—a lower grade of punishment— for his compliance with prison rules and policies, including the SOMM program, as well as any number of other behavioral or rehabilitative programs that the DOC and the General Assembly might endorse. It neither excuses, nor waives, nor vitiates the remainder of his fixed term of his imprisonment. And the revocation of his parole does not mean he goes from being at full liberty

47

to being fully detained, as he portrays it—instead it means he goes from being detained at a comparatively low level back to being fully detained. In that way it is little different, in the pure legal sense, than him being reassigned from a minimum-security facility, or a community transition program, to a medium- or maximum-security facility for violating prison rules and policies.

And along these same lines, Bleeke also argues that just as he would lose credit time for failing to participate in the program while incarcerated, "[i]f he refuses to participate as a parolee he will have his parole revoked." (Appellant's Br. at 47.) "A parolee who will not admit he committed the underlying crime or crimes cannot successfully complete treatment, that is unless he 'passes' a lie detector test on the subject." (Appellant's Br. at 48.) Likewise, he says, refusing to submit to polygraphs about his sexual history "would result in a revocation of parole, extending incarceration." (Appellant's Br. at 48.)

However, a person whose parole is revoked "shall be imprisoned for all or part of the remainder of the person's fixed term." Ind. Code § 35-50-6-1(c) (Supp. 2013). The statute does not permit the imposition of an additional sentence to the fixed term. Furthermore, the violation of a parole condition cannot be used as grounds to deprive a parolee of previously earned credit time, nor may it be the basis for reassignment to a new credit class. Ind. Code §§ 35-50-6-4, -5(a). And as we further explained the relationship between credit time and parole in Boyd v. Broglin,

> [c]redit time is a statutory reward for a lack of conduct that is in violation of institutional rules. It is earned toward release on parole for felons, and does not diminish the fixed term or affect the date on which a felony offender will be discharged. . . . A felon serving a sentence which was imposed under Ind. Code § 35-50-1-1 *et seq.* is released on parole . . . after service of his fixed term less the credit time earned with respect to that term. . . . A felon sentenced under Ind. Code § 35-50-1-1 *et seq.* is on parole until the expiration of his fixed term, until discharged by action of the

48

> Indiana Parole Board, or for a period of one year, whichever event first occurs, unless the Indiana Parole Board revokes the parole. . . . [T]he legislative intent is clear that credit time is applied only toward the date of release on parole for felons and does not diminish the fixed term.

519 N.E.2d 541, 542–43 (Ind. 1988). In other words, Bleeke's participation in the SOMM program while incarcerated (or in the community transition program) provided a benefit that made him eligible for an early release to parole. Once on parole, participation in the SOMM program kept him from returning to prison to serve out his fixed term—non-participation would not extend his fixed term, nor would it take away his previously earned credit time. And returning to incarceration does not deprive a former parolee of the opportunity to continue earning credit time that would allow him or her to qualify for reinstatement to parole before the conclusion of the fixed term. See Ind. Code § 35-50-6-1(c).

So to the extent Bleeke argues that the potential revocation of his parole for failure to comply with the SOMM program would extend his incarceration, and thereby violate his Fifth Amendment privilege because it would send him back to jail from parole to serve out his fixed term, that argument fails. For the same reasons we provided above with respect to the second phase of the SOMM program, such a circumstance would fall under the Parole Board's power to offer a constitutionally permissible choice to a lawfully convicted offender: comply with your parole requirements, or serve out the full sentence received as a result of your lawful conviction.

We do recognize, however, that the parole statutes create the possibility of a lengthier period of parole for sex offenders, when compared to the offender's fixed term of incarceration. This is because Ind. Code § 35-50-6-1(b), which provides that "[a] person released on parole remains on parole from the date of release until the person's fixed term expires, unless the person's parole is revoked or the person is discharged from that term by the parole board," and requires the Parole Board to discharge a parolee after the period of parole set by the statute "or the expiration of the person's fixed term, whichever is shorter," does not apply to sex offenders.

49

Instead, Ind. Code § 35-50-6-1(d) provides that "[w]hen a sex offender . . . completes the sex offender's fixed term of imprisonment, less credit time earned with respect to that term, the sex offender shall be placed on parole for not more than ten (10) years." See also Ind. Code § 35-50-6-1(b) ("This subsection does not apply to a person described in subsection (d)").

So it is theoretically possible, under Indiana's parole statutes, for a sex offender to be released from incarceration after serving a portion (or all) of his or her fixed term of imprisonment, and then receive a statutorily mandated assignment to parole for a period which exceeds the time remaining on that fixed term. The statutes do not provide a consequence for if such a parolee violates his or her parole after the expiration of the fixed term. So if, say, such a parolee refused to take a polygraph related to his sexual history because he or she believed it would provide self-incriminating responses without the promise of immunity, could the Parole Board send the parolee to jail? Would the threat of such a period of incarceration—imposed above and beyond the now-expired original sentence—constitute an attempt at unconstitutional compulsion?

But that scenario is not before us today. Here, Bleeke was sentenced in 2005 to an aggregate term of ten years in prison. He remained incarcerated until 2008, when he was released to a community transition program. And he began parole in 2009, with his parole set to run until 2015. His parole therefore appears matched to his fixed term of incarceration, and there seems to be no risk that he will be subject to its conditions beyond his original release date (nor does he present such a claim). So to the extent he risks a return to prison for failure to comply with the third phase of the SOMM program, that return to prison is merely to serve the remainder of his fixed sentence, and its threat is not compulsion in violation of his Fifth Amendment privilege against self-incrimination.

## Conclusion

We therefore reverse the trial court's grant of summary judgment in favor of the Parole Board with respect to Bleeke's additional parole conditions 4, 5, 17, 19, and 20, and remand with instructions that it enter an order enjoining the Parole Board from enforcing those conditions. We summarily affirm the Court of Appeals opinion below with respect to its analysis of Bleeke's additional parole conditions 8, 15, 17, and 19, and his challenges to Ind. Code §§ 11-13-3-4(g) and 35-42-4-11, and remand with instructions that the trial court also enter an order enjoining the Parole Board from enforcing conditions 8 and 15 unless it clarifies them first, and enjoining the Parole Board from enforcing those statutory parole conditions derived from the unconstitutionally overbroad labeling of Bleeke as an "offender against children." But we affirm the trial court's grant of summary judgment in favor of the Parole Board with respect to Bleeke's remaining additional conditions.

And we likewise affirm the trial court's grant of summary judgment to the Parole Board with respect to Bleeke's claims about the constitutionality of the SOMM program. The program is a valuable tool aimed at the legitimate purpose of rehabilitating sex offenders before they are fully released from State control, and its requirements do not violate the Fifth Amendment's privilege against self-incrimination.

Dickson, C.J., Rucker, Massa, and Rush, JJ., concur.