

FILED

Feb 02 2015, 9:48 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANT

Gregory F. Zoeller
Attorney General of Indiana

David L. Steiner
Frances Barrow
Kyle Hunter
Deputy Attorneys General
Indianapolis, Indiana

ATTORNEYS FOR AMICI CURIAE
INDIANA WILDLIFE FEDERATION
INDIANA CHAPTER OF THE
WILDLIFE SOCIETY, AND INDIANA
DEER HUNTERS ASSOCIATION

Jon Laramore
Stephanie Boxell
Sarah Sharp
Faegre Baker Daniels, LLP
Indianapolis, Indiana

ATTORNEY FOR APPELLEES
BACKWOOD PRESERVE, INC.,
MIDWEST WOODLOTS, LLC, AND
SHAWN TAYLOR D/B/A T.C.
OUTDOOR

W. Douglas Lemon
Miner & Lemon LLP
Warsaw, Indiana

ATTORNEYS FOR APPELLEES
WHITETAIL BLUFF LLC AND
RODNEY BRUCE

Bryan H. Baab
Bose McKinney & Evans LLP
Indianapolis, Indiana

William C. Moyer
Lorch & Naville, LLC
New Albany, Indiana

ATTORNEYS FOR AMICI CURIAE
NATIONAL FEDERATION OF
INDEPENDENT BUSINESS SMALL
BUSINESS LEGAL CENTER, THE
NORTH AMERICAN DEER
FARMERS ASSOCIATION, INDIANA
DEER AND ELK FARMERS
ASSOCIATION AND THE INDIANA
AGRICULTURAL LAW
FOUNDATION

Stephen J. Peters
William N. Ivers
Harrison & Moberly, LLP
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Indiana Department of Natural Resources, and Cameron F. Clark as Director of the Indiana Department of Natural Resources,

*Appellants,*

v.

Whitetail Bluff, LLC, Rodney Bruce, Backwoods Preserve, Inc., Midwest Woodlots, LLC, and Shawn Taylor d/b/a T.C. Outdoors,

*Appellees.*

February 2, 2015

Court of Appeals Cause No. 31A04-1310-PL-502

Appeal from the Harrison Circuit Court
Honorable John Evans, Judge
Cause No. 31C01-0508-PL-033

**Friedlander, Judge.**

[1] The Indiana Department of Natural Resources (IDNR) appeals a grant of summary judgment in favor of Whitetail Bluff, LLC, Rodney Bruce, Backwoods Preserve, Inc., Midwest Woodlots, LLC, and Sean Taylor d/b/a T.C. Outdoors (Whitetail Bluff). The issue ultimately presented in this case is whether current Indiana statutory law prohibits "high fence" hunting of wild animals – in this case, deer.

[2] We affirm.

Rodney Bruce wanted to establish a business in southern Indiana that would offer hunting, fishing, and lodging. The hunting he proposed to offer was what is termed "high-fence" hunting. This refers to hunting wild animals on property that is enclosed by a fence. To this end, in 1997, Bruce purchased 116 acres of wooded, hilly ground located in Harrison County, Indiana. Before commencing his project, however, Bruce contacted IDNR to determine whether high-fence hunting was legal in Indiana. In a February 23, 1999 letter, Bruce detailed his plans, which he described as a "life long dream." *Appellant's Appendix* at 29. These plans included the construction of a nine-foot fence around the entire property, allocating nine acres of the property for breeding white-tailed deer, and permitting in-season hunting of deer on the property. He concluded the letter as follows:

> MY QUESTION IS, CAN I LEGALLY CHARGE PEOPLE TO
> COME TO MY PLACE FOR THIS VACATION/HUNTING
> EXPERIENCE. I DO NOT GUARANTEE SUCCESS AT ANY OF
> THE ITEMS LISTED ABOVE. I AM CHARGING PEOPLE FOR
> THEIR ROOM AND BOARD AND OPPORTUNITY TO DO
> ANY OR ALL OF THE ITEMS OFFERED.
>
> GRANTED THAT 90 PERCENT OF MY BUSINESS WILL BE
> FROM PEOPLE WANTING AN OPPORTUNITY TO HUNT
> AND KILL A WHITETAIL DEER. THEY WILL NOT BE ABLE
> TO HUNT OR KILL DEER IN THE NINE ACRE BREEDING
> PEN. THEY MAY ONLY HUNT IN THE 107 ACRES WHERE
> THE DEER ARE FREE TO ROAM. I INTEND TO PURCHASE
> SOME DEER AND TURN THEM LOOSE IN THE 107 ACRES
> TO BREED AND MULTIPLY SO THAT PEOPLE CAN HUNT
> 100 PERCENT FAIR CHASE WILD AND FREE ROAMING
> GAME WITHIN THE 107 ACRES.

PLEASE REVIEW THE ASPECTS OF THIS BUSINESS CAREFULLY AND GIVE ME SOME FEEDBACK. PLEASE CALL IF MORE INFORMATION IS NEEDED. I WOULD LIKE TO PRESENT YOUR REPLY TO THE LOCAL CONSERVATION OFFICER WHEN HE INSPECTS MY BREEDING PEN. THIS WILL ENSURE HIM THAT THIS IS NOT A HUNTING PRESERVE AND I HAVE INVESTIGATED ALL ASPECTS OF THIS BUSINESS AND FOUND THEM TO BE TOTALLY LEGAL IN THE STATE OF INDIANA.

*Id.* at 30. On March 25, 1999, Bruce received the following response from Col. Larry D Allen of IDNR's law enforcement division:

Officials from both the Law Enforcement Division and Division of Fish and Wildlife met and reviewed your letter dated February 23, 1999 (enclosed). At this time we can find nothing illegal or contrary to our hunting laws regarding your business proposal and plans as detailed in your letter. Unless there is additional information of which we are not aware, I believe that you are on legal ground with us to proceed with your "life-long dream".

However, please be aware of the fact that state statutes and rules may change in the future that would disallow the type of business venture that you have described to us. Whether or not previously established businesses of this type would be allowed to continue after the possible law change is unknown at this time.

*Id.* at 31.

[4] After receiving IDNR's approval, Bruce expended considerable time and money in preparing his property to accommodate the business venture – Whitetail Bluff – outlined in his February 23 letter to IDNR. He erected a fence around the entire property and complied with a local IDNR conservation officer's directive to drive all of the wild deer off of his property before

completely enclosing it with a fence and re-populating it with privately owned deer. Whitetail Bluff thereafter commenced business operations. In September 2002, IDNR informed Bruce that his operation "present[ed] a problem for the classified forests status of the property". Id. at 236. The letter explained that pursuant to Section 7 of the Indiana Classified Forests Act of 1921, "[a] parcel of land may not be classified as native forest land or as a forest plantation if it is grazed by a domestic animal." Id. The letter continued:

> [D]eer would not ordinarily be considered domestic animals, however, for the purpose of the Classified Forest Act the fact that the animals are confined and concentrated in a relatively small area resulting in detrimental effects on timber production makes the difference. The relatively large number of animals per acre results in the destruction of the litter layer on the forest floor and the exposure of bare soil. The soil is also compacted increasing water runoff. Tree roots are exposed and damaged and the understory vegetation, both woody and herbaceous, is largely eliminated.

Id. Bruce was informed that, as a result, the status of 4.552 acres of his property was being changed from classified forest and consequently he owed $75.29 in back taxes. In May 2003, Bruce received a letter from Michael E. Coggeshall, IDNR's District Forester, conveying the results of a "reinspection report" of Whitetail Bluff's operation and grounds and recommending that Whitetail Bluff continue to maintain access trails and also recommending the removal of several deer from certain areas of the property. Id. at 237. In December 2003, IDNR informed Bruce that it was denying his request to obtain out-of-season permits to control crop depredation within

Whitetail Bluff's fenced area. The request was denied in part because IDNR believed the crops might have been planted as a lure crop for the deer.

[5] Bruce had obtained a game breeder's license in 1999 when he purchased the first animals for Whitetail Bluff. This license required that he report the number of deer that were bought, sold, killed, and that died on his property. IDNR entered his property annually to inspect the breeding pen and monitor the health of the animals located on the property. All captive-deer operations are subject to regulation by the Indiana State Board of Animal Health (BOAH). In September 2004, BOAH informed Whitetail Bluff that cervid[1] owners were required to tag their animals in connection with BOAH's Chronic Wasting Disease (CWD) Certification Program. When an animal is killed on Whitetail Bluff property, the head is sent to BOAH for CWD testing. As the foregoing reflects, from the time Whitetail Bluff commenced operations through 2004, IDNR was in regular contact with Whitetail Bluff concerning different aspects of its operation and did not question its legality.

[6] Sometime in or around 2004, Representative William C. Friend of the Indiana House of Representatives requested an opinion from the Indiana Attorney General's Office "on a number of questions relating to Indiana's regulation of white-tailed deer …, with particular reference to those deer that are kept in privately-owned compounds for either breeding or hunting." *Id*. at 32. The Attorney General's written opinion included the following summarization:

---

[1] "Cervid" refers to any member of the deer family, Cervidae, which is comprised of deer, caribou, elk, and moose.

"Indiana's existing statutes and rules do not directly address many of the questions surrounding the complicated and controversial issue of hunting privately owned deer kept on private property." *Id.* The opinion also included the following observation:

> Asked to make recommendations to the BOAH, DNR, and the General Assembly, the CACCC [i.e., Citizen Advisory Counsel on Captive Cervids] undertook a series of public meetings "to hear what Hoosiers think about the issues". Its *Final Report* dated June 10, 2004, identifies several areas in which the authority of the BOAH and DNR either overlap or is poorly defined. CACCC's *Final Report* also details a number of issues on which consensus could not be reached in the resolution of which may require legislative intervention."

*Id.* at 38.

[7] On February 10, 2005, Gov. Mitch Daniels named Kyle Hupfer as the new director of IDNR. In August 2005, IDNR purported to adopt a temporary modification of 312 IAC 9-3 (the Emergency Rule) governing exotic mammals. The modification included deer within the definition of "exotic mammal." The modification further provided: "A person may not possess an exotic mammal that is in a family listed in subsection (b) except as otherwise provided by statute or by this article." *Id.* at 40. The purpose of the modification was explained in an August 11, 2005 press release from Hupfer and IDNR:

> Over the past few months, the DNR has conducted a thorough review of the fenced Whitetail deer shooting issue. This has been an ongoing controversy over the past several years. In the course of the 2005 legislative session, the issue of cervidae farming was addressed by the General Assembly. They passed legislation that specifically authorized the agricultural pursuit of cervidae farming. That same

legislation specifically precluded the hunting of cervidae livestock. [2]
During the same legislative process, the shooting of Whitetail deer
behind high fence [sic] was left to the new DNR administration to
address.

* * * * *

In order to possess a Whitetail deer in Indiana, an individual must
obtain a Game Breeders License from the DNR. The scope of the
Game Breeders License is limited to the propagation of an animal in
captivity or the possession, purchase or sale of an animal solely for the
purpose of propagation.

After taking the time as a new Administration to understand the entire
statutory scheme in this area and after consultations with the Office of
Attorney General, we believe that the existing Game Breeders Statute
is clear, and always has been clear. A Game Breeders License does
not allow the hunting or purposeful killing of animals maintained
under that license.

Exotic mammals are also being hunted behind high fence in Indiana.
… It appears that these exotic hunting operations have felt a loophole
in the law exists that allows this type of hunting. However, it appears
clear that exotic mammals may only be propagated and hunted
pursuant to the Shooting Preserve Statute. That statute requires the
DNR to adopt rules specifying exotic mammals that can be hunted,
and that the operator obtain a license from the DNR before operating
an exotic hunting preserve. The DNR has never identified any exotic
mammals to be hunted pursuant to the Shooting Preserve Statute.

Because of the potential of a legal misinterpretation of the statutory
scheme surrounding the hunting of exotic mammals, I have today
signed an emergency rule that closes all potential loopholes with

---

[2]As will be explained more fully below, Ind. Code Ann. § 14-22-20.5-2 (West, Westlaw current with all 2014 Public Laws of the 2014 Second Regular Session and Second Regular Technical Session of the 118th General Assembly) was the legislation to which this must have referred.

> respect to the hunting of exotic mammals. The DNR will immediately
> begin permanent rulemaking with the Natural Resources Commission
> on this issue.

*Id.* at 42-43 (footnote supplied). The effect of the Emergency Rule was that only individuals possessing a Game Breeders License can possess whitetail deer, and further that a Game Breeders License does not allow hunting of animals maintained under that license. The ramifications of the Emergency Rule concerning Whitetail Bluff's operation was clear: high-fence hunting would no longer be permitted.

[8] At this point, Bruce declined to renew his Game Breeder's License and consequently it expired on December 31, 2005. On March 30, 2006, IDNR sent Bruce a letter advising him that as a result of his failure to renew his license, the possession of the white-tailed deer on his property had been illegal since February 15, 2006. He was further advised: "if you fail to submit the application and fee within that time, legal action may be taken for your illegal possession of white-tailed deer without a license. Such legal action includes law enforcement, citation, and referral to the local prosecutor or Attorney General." *Id.* at 44.

[9] On August 24, 2005, Whitetail Bluff filed a verified complaint seeking a declaratory judgment that the Emergency Rule and any similar replacement rules are a nullity and have no legal effect. Whitetail Bluff also sought an order to enjoin the IDNR from attempting to regulate Whitetail Bluff's operation. On June 14, 2013, IDNR filed a motion for summary judgment asking the court to

rule as a matter of law that high-fence deer hunting operations are contrary to statute because wild animals such as deer may be possessed only pursuant to the provisions of I.C. § 14-22-6-1 (West, Westlaw current with all 2014 Public Laws of the 2014 Second Regular Session and Second Regular Technical Session of the 118th General Assembly), and that "[n]o statute or rule allows for possession of wild animals as part of a high fence hunting operation." *Id.* at 314. On June 17, 2013, Whitetail Bluff countered with a summary judgment motion of its own, arguing that IDNR's attempt to regulate high-fence hunting amounted to an unconstitutional usurpation of the legislative function of the Indiana General Assembly. The court conducted a hearing on the competing motions on September 4, 2013, and several weeks later entered an order granting Whitetail Bluff's motion and denying IDNR's motion. IDNR appeals those rulings.

[10] IDNR appeals from a grant of summary judgment. Summary judgment is appropriate where the moving party shows there are no genuine issues of material fact with respect to a particular issue or claim. Ind. Trial Rule 56(C); *Bleeke v. Lemmon*, 6 N.E.3d 907 (Ind. 2014). When reviewing a ruling involving statutory construction, which is a pure question of law, we employ a *de novo* standard of review. *Evansville Courier & Press v. Vanderburgh Cnty. Health Dep't*, 17 N.E.3d 922 (Ind. 2014). Pure questions of law such as the one in the present case are particularly appropriate for summary resolution. *Id.* Where the moving party designates material demonstrating there are no genuine issues of material fact with respect to a particular issue or claim, the burden shifts to the

non-moving party to come forward with designated evidence showing the existence of a genuine issue of material fact. *Hughley v. State*, 15 N.E.3d 1000 (Ind. 2014). The appellant bears the burden of demonstrating that the grant of summary judgment was erroneous. *Id.* Finally, we will affirm a grant of summary judgment on any theory supported by the record. *Holiday Hospitality Franchising, Inc. v. AMCO Ins. Co.*, 983 N.E.2d 574 (Ind. 2013).

[11] The overarching question in this case is whether Indiana's statutory scheme pertaining to the hunting of wild deer allows or, in the alternative, forbids high-fence hunting. IDNR contends that I.C. § 14-22-20.5-2 "explicitly forbids the hunting of the privately owned deer of these breeding operations." *Appellant's Brief* at 16. Thus, according to IDNR, pursuant to its authority over such operations under I.C. § 14-22-1-1(b) (West, Westlaw current with all 2014 Public Laws of the 2014 Second Regular Session and Second Regular Technical Session of the 118th General Assembly), the rules it has enacted to that end must be enforced and Whitetail Bluff's high-fence hunting operation must cease. Whitetail Bluff counters first that under I.C. § 14-22-1-1, IDNR does not have jurisdiction over wild animals that are legally owned or being held in captivity under a license or permit, such as is the case here. Secondly, Whitetail Bluff contends that the General Assembly has not prohibited high-fence hunting, and that IDNR overstepped its authority in promulgating rules to that effect. Specifically, Whitetail Bluff contends the rules in question, and most especially the Emergency Rule, violate the separation of powers doctrine contained in article 3, section 1 of the Indiana Constitution.

As we have indicated, the pivotal question in this case is whether IDNR is correct in asserting that the current statutory scheme prohibits high-fence hunting, and therefore that IDNR is authorized to promulgate rules effectuating that prohibition. IDNR cites two provisions as the bases for this argument. The first is I.C. § 14-22-1-1, which provides as follows:

> (a) All wild animals, except those that are:

> (1) legally owned or being held in captivity under a license or permit as required by this article; or

> (2) otherwise excepted in this article;

> are the property of the people of Indiana.

> (b) The department shall protect and properly manage the fish and wildlife resources of Indiana.

IDNR contends this provision confers authority upon IDNR to regulate *all* wildlife resources in Indiana, including those described in the exception set out in subsection (a) as cervidae legally owned or held in captivity under a license or permit, and most especially including privately owned wild animals such as the deer on Whitetail Bluff property. In conjunction with this argument, IDNR contends that subsections (a) and (b) are independent of each other, meaning that regardless of whether wild animals are included in the exception described in subsection (a), they are subject to IDNR management under subsection (b).

[14] Whitetail Bluff counters that subsections (a) and (b) of I.C. § 14-22-1-1 should be read in conjunction with one another, meaning that the broad conferral of authority under subsection (b) is limited to those wild animals not mentioned in the exception set out in subsection (a). Put another way, Whitetail Bluff contends that IDNR has authority under subsection (b) to protect and manage fish and wildlife in Indiana that are the property of the people of Indiana, which pursuant to subsection (a) does not include those that are legally owned or being held in captivity under license.

[15] When interpreting the meaning of a statute, we must first determine whether the General Assembly has spoken clearly and unambiguously on the subject in question. *Basileh v. Alghusain*, 912 N.E.2d 814 (Ind. 2009). If a statute is clear and unambiguous on that matter, no rules of construction are necessary – in such case, words and phrases will be taken in their plain, ordinary, and usual sense. *Id.* On the other hand, when a statute is susceptible to more than one interpretation, it is deemed to be ambiguous and therefore open to judicial construction. *Id.* When construing the meaning of a statute we deem to be ambiguous, we apply other well-established rules of statutory construction. Primary among such rules is that the "goal of statutory construction is to determine, give effect to, and implement the intent of the Legislature" as expressed in the language utilized in the statute. *Id.* at 821.

[16] The Seventh Circuit Court of Appeals has considered this very question in the context of Ind. Code Ann. § 14-2-1-2, the predecessor to I.C. § 14-22-1-1. I.C. § 14-2-1-2 provided, in pertinent part:

The department of natural resources shall have the authority and responsibility to protect and properly manage the fish and wildlife resources of the state. Any and all wild animals, except those which are legally owned or being held in captivity under a license or permit as required by this article or is otherwise excepted in this article, shall be the property of the people of the state of Indiana and the protection, reproduction, care, management, survival, and regulation of the wild animal population shall be entrusted to the division of fish and wildlife of the Department of natural resources.

This provision was repealed and replaced by I.C. § 14-22-1-1 in 1995 when Title 14 of the Indiana Code governing natural and cultural resources was recodified. *See* P.L. 1-1995 § 91. In *DeHart v. Town of Austin, Ind.*, 39 F.3d 718, 723 (7th Cir. 1994), the appellant, DeHart, owned and operated a business that bought, bred, raised, and sold exotic and wild animals. After he had operated this business for several years, the town in which the business was located passed an ordinance making it unlawful to keep an animal defined as a wild animal within town limits. DeHart challenged this ordinance as unconstitutional and sought a declaratory judgment and injunctive relief. The trial court granted the town's subsequent motion for summary judgment and DeHart appealed.

On appeal, DeHart argued among other things that the town ordinance was preempted by state statute, that the ordinance was an impermissible attempt to regulate interstate commerce in violation of Article 1, section 8 of the United States Constitution, and that the result constituted a deprivation of his property interest in his federal and state licenses, in contravention to the Fourteenth Amendment. In addressing the preemption claim with respect to Indiana law, the court considered DeHart's argument that under I.C. § 14-2-1-2, IDNR had

the sole authority to regulate wild animals and that the town therefore did not. In rejecting this argument, the court concluded, "Indiana Code § 14-2-1-2 only applies to 'the fish and wildlife resources of the state.' Animals which are held in captivity under a license or permit are specifically excluded from this classification. *See* Ind.Code § 14-2-1-2." *DeHart v. Town of Austin, Ind.*, 39 F.3d at 723. In other words, the court in *DeHart* agreed with the position advocated here by Whitetail Bluff, i.e., that I.C. § 14-2-1-2 (now I.C. § 14-22-1-1) should be construed to mean that IDNR has authority to manage all fish and wildlife in Indiana *except* animals that are legally owned or being held in captivity under license or permit. IDNR responds that *DeHart* is not controlling here because the statute that it construed was repealed and replaced. IDNR is correct in that the statute construed in *DeHart* was a predecessor to the current version of the statute. This is not to say, however, that the current version of the statute represents a significant departure from the former.

[18]    It appears to us that the differences between the two versions are primarily differences in form. I.C. § 14-22-1-1 is set out in outline form, whereas I.C. § 14-2-1-2 is set forth in paragraph form. Substantively, however, they are quite similar. Both provide that IDNR has the authority "to protect and properly manage the fish and wildlife resources" of the state. I.C. § 14-2-1-2 provides that "all wild animals, except those which are legally owned or being held in captivity under license or permit" are the property of the people of the State of Indiana. It goes on to provide that IDNR has authority over the animals thus designated as "property of the people of the State of Indiana." In the current

version, subsection (a) establishes the same categorization and exception, i.e., that except for "wild animals … legally owned or being held in captivity under license or permit", wild animals located in this state are the property of the people of Indiana. Subsection (b) goes on to provide that IDNR shall protect and manage the fish and wildlife resources of Indiana. We are hard-pressed to understand why the exception described in subsection (a) was created if it was not to be understood in juxtaposition to the general conferral of authority set out in subsection (b). *See Toomey v. State*, 887 N.E.2d 122, 124 (Ind. Ct. App. 2008) (when construing the meaning of a statute, "we attempt to give meaning and effect to every word" in the statute). Without this connection between subsections (a) and (b), the exception aspect of subsection (a) seems superfluous and without meaning.

[19] Of course, as IDNR observes, *DeHart* is not binding on this court. And, we acknowledge that the statute it construed, I.C. § 14-2-1-2, was subsequently modified and recodified in the form in which it appears today in I.C. § 14-22-1-1. Nevertheless, we conclude that the two versions are, substantively speaking, quite similar. Moreover, we find ourselves in agreement with the *DeHart* court's interpretation of the relationship between the exception described therein and the ensuing general conferral of authority. Accordingly, we hold that I.C. § 14-22-1-1 does not confer authority on IDNR to protect and manage wild animals that are legally owned or being held in captivity under a license or permit.

[20]   We now move on to the second question IDNR presents, which is whether the current statutory scheme prohibits high-fence hunting. IDNR contends that it does so in I.C. § 4-22-20.5-2, which IDNR asserts "explicitly forbids the hunting of the privately owned deer of … breeding operations." *Appellant's Brief* at 16. This provision provides as follows:

> As used in this chapter, "cervidae livestock operation" means an operation that:
>
> (1) has a game breeders license issued by the department of natural resources under IC 14-22-20;
>
> (2) contains privately owned cervidae; and
>
> (3) involves the breeding, propagating, purchasing, selling, and marketing of cervidae or cervidae products; but does not involve the hunting of privately owned cervidae.

I.C. § 14-22-20.5-2. We cannot agree that this provision prohibits the hunting of deer owned by breeding operations. In fact, this provision does not address any activity at all, much less prohibit or authorize it. Rather, it is merely a definitional section. In pertinent part, it defines what a cervidae livestock operation is, and clarifies that this term does not describe an operation involving the hunting of privately owned cervidae. In short, I.C. § 14-22-20.5-2 does not prohibit the activity of high-fence hunting. In fact, it says nothing about it.

[21] We wish to make several observations at this point. We commend the parties and *amici curiae* for the quality of the analysis they have provided in arguing their respective positions on the question of whether high-fence hunting has been expressly prohibited by statute in this state. They raise several issues that, in light of our conclusions, we need not address. For instance, *amicus curiae* National Federation of Independent Business Small Business Legal Center, et al. (SBLC) presents compelling argument on the implications of IDNR's reversal of course on the legality of high-fence hunting in Indiana. In a nutshell, SBLC contends that IDNR should not be allowed to change the position it took in assuring Whitetail Bluff in 1999 and for several years thereafter that high-fence hunting is legal in Indiana. SBLC makes a compelling argument that IDNR's "change in position would essentially result in revocation of a previous authorization to engage in a business practice after the company has already expended substantial resources in reasonable reliance [on] the authorization." *Brief of Amici Curiae, Nat'l Fed'n of Indep. Bus. Small Bus. Legal Ctr., et al.* at 10. For this reason, SBLC contends, IDNR's altered interpretation of the statute is not entitled to the deference that is customarily extended by this court. *See, e.g., Whinery v. Roberson*, 819 N.E.2d 465, 477 (Ind. Ct. App. 2004) ("an agency's interpretation of a relevant provision that conflicts with an earlier interpretation is entitled to considerably less deference than a consistently held agency view"), *trans. dismissed*. We agree.

[22] *Amicus curiae* Indiana Wildlife Federation and Indiana Deer Hunters Association (IWF) joins IDNR in arguing that IDNR's second interpretation of

the controlling statutes is correct and that Indiana statutory law forbids high-fence hunting. IWF directs our attention to several sections of the Indiana Code in cobbling together an argument that, more by implication than anything else, the General Assembly meant to forbid high-fence hunting. We have already explained why we reject this argument with respect to the two provisions that most directly address the question, i.e., I.C. § 14-22-1-1 and I.C. § 14-22-20.5-2. We also note that IWF cites several provisions in the Indiana Administrative Code (i.e., 312 IAC 9-3-2(z), 312 IAC 9-3-18.5, and 312 IAC 9-10-4), but of course, this essentially begs the question because the Indiana Administrative Code consists of rules and regulations passed by agencies pursuant to authority conferred upon them by the General Assembly. The validity of those provisions depends entirely upon whether the subject matter addressed in those provisions falls within the scope of authority granted to the relevant agency by the General Assembly. *See Indiana Dep't of State Revenue v. Best Ever Cos., Inc.,* 495 N.E.2d 785, 787 (Ind. Ct. App. 1986) (an administrative board "may not by its rules and regulations add to or detract from the law as enacted, nor may it by rule extend its powers beyond those conferred upon it by law") (quoting *Indiana Dep't of State Revenue v. Colpaert Realty Corp.,* 231 Ind. 463, 479-80, 109 N.E.2d 415, 422-23 (1952)) (emphasis deleted). In this case, we have ruled that they do not.

[23]     Finally, IWF offers a thoughtful and excellent primer on the specifics and ethics of high-fence hunting, which it consistently refers to as "canned hunting." These policy arguments are best directed to the General Assembly, which has

not yet prohibited the practice. Along the same lines, we note the views expressed by our colleague in dissent that high-fence hunting should be stopped because it threatens some deer with the spread of infection, and indeed, by implication, threatens generally the very survival of that species – or any species that is hunted in this fashion. The dissent also comes down firmly on the side that views high-fence hunting as unethical. We presume these are factors in our colleague's conclusion on the question before us. These views find support among the opponents of this sort of hunting, but the proponents of high-fence hunting offer countervailing arguments to these claims that are at least plausible. Indeed, these are public policy concerns that should be carefully and thoroughly weighed in reaching a decision regarding the viability of this practice. We do not believe, however, that it is within our purview to perform this task.

[24] Our decision is not informed by our views regarding the ethics of high-fence hunting or the consequences of this practice with respect to the deer population of Indiana. Rather, it seems that the fundamental point of departure between our views on the question and those of the dissent is whether the current Indiana legislation addressing this subject can be fairly understood to prohibit the practice. Our colleague believes that it can. We, on the other hand, agree with the opinion issued by the Indiana Attorney General's office in 2004 at the behest of Representative Friend that Indiana's "existing statutes and rules do not directly address many of the questions surrounding the complicated and controversial issue of hunting privately owned deer kept on private property."

*Appellant's Appendix* at 32. The lack of direction provided in the current statutory scheme is plainly reflected in the fact that in a matter of only six years, IDNR issued two diametrically opposed interpretations of the same statutes. We agree with the 2004 observation of the Indiana Attorney General's Office: if high-fence hunting is to be prohibited in Indiana, it will require further legislative intervention.

[25] In summary, we hold that Article 22 of Title 14 of the Indiana Code does not prohibit high-fence hunting of deer in Indiana. Therefore, in prohibiting Whitetail Bluff from operating its high-fence hunting operation, IDNR went beyond the express powers conferred upon it by the General Assembly in conjunction with its charge to IDNR to manage Indiana's wildlife. We further hold that pursuant to I.C. § 14-22-1-1, IDNR is not authorized to manage the deer on Whitetail Bluff's property because those animals are exempted under I.C. § 14-22-1-1(a) from the general grant of authority conferred upon IDNR under I.C. § 14-22-1-1(b).

[26] Judgment affirmed.

[27] May, J., concurs and Vaidik, C.J., dissents with opinion.

# IN THE
# COURT OF APPEALS OF INDIANA

Indiana Department of Natural Resources, and Cameron F. Clark as Director of the Indiana Depart of Natural Resources,

*Appellants,*

v.

Whitetail Bluff, LLC, Rodney Bruce, Backwoods Preserve, Inc., Midwest Woodlots, LLC, and Shawn Taylor d/b/a T.C. Outdoors,

*Appellees.*

February 2, 2015

Court of Appeals Cause No. 31A04-1310-PL-502

Appeal from the Harrison Circuit Court
Honorable John Evans, Judge
Cause No. 31C01-0508-PL-033

**Vaidik, Chief Judge, dissenting**.

This case involves high-fence hunting of white-tailed deer. This is also known as canned hunting—the shooting within high-fence enclosures of farm-raised deer that are bred for unnaturally massive antlers. The dangers of canned hunting include infection—specifically, chronic wasting disease (CWD)—and unethical hunting practices, such as the concept of fair chase. *See* Ryan Sabalow, *Trophy Deer Industry Linked to Disease, Costs Taxpayers Millions*, Indianapolis Star, Mar. 27, 2014, http://indy.st/1mxxhiY (discussing both CWD and shooting—for a $15,000 fee inside a one-acre pen—a deer so ill that a ranch hand had to poke the deer with a sharp stick to get it to stand).

The majority says IDNR cannot regulate in any way high-fence hunting under current Indiana statutory law. The majority does not argue that deer are not wild animals.[3] Rather, the majority relies mainly on Indiana Code section 14-22-1-1, the opening section to the chapter that determines that wild animals are the property of the people of Indiana (with a few exceptions) and that IDNR's job is to protect and manage resources:

> (a) All wild animals, except those that are:
>
> (1) legally owned or being held in captivity under a license or permit as required by this article; or
>
> (2) otherwise excepted in this article; are the property of the people of Indiana.
>
> (b) The department shall protect and properly manage the fish and wildlife resources of Indiana.

The majority holds that Section 14-22-1-1 "does not confer authority on IDNR to protect and manage wild animals that are legally owned or being held in captivity under a license or permit." Slip op. at 16. In other words, if a wild animal is excepted under subsection (a), then IDNR cannot protect and manage it under

---

[3] Even if the majority argued that deer were not wild animals, the law provides otherwise. For purposes of Indiana Code article 14-22, "wild animal" means "an animal whose species usually lives in the wild or is not domesticated." Ind. Code § 14-8-2-318(a), (b) (formatting altered). Because deer usually live in the wild and are not domesticated, they are wild animals. *See also* Appellants' App. p. 307, 483, 486-90, 497 (parties conceding deer are wild animals). In addition, if deer were not subject to the wildlife and hunting authority of IDNR, then Whitetail Bluff would be permitted to possess deer only under the statute for cervidae-livestock operations. *See* Ind. Code § 14-22-20.5-2. If considered livestock, then Whitetail Bluff's deer would be subject to humane-slaughter practices. *See* Ind. Code § 15-17-5-1. Rodney Bruce had a game-breeder's license, but it expired on December 31, 2005.

subsection (b).[4] I disagree with the majority's interpretation of Section 14-22-1-1 based on the plain language of the statute. *See State v. Coats*, 3 N.E.3d 528, 531 (Ind. 2014) ("Where the statute's language is unambiguous, we read each word in the 'plain, ordinary, and usual sense.'"), *cert. denied*.

[31] Subsection (a) addresses ownership of wild animals. That is, all wild animals are the property of the people of Indiana, except those animals that are legally owned or being held in captivity under a license or permit in Article 22. But subsection (b) is independent of and broader than subsection (a). Subsection (b) addresses the protection and management of the fish and wildlife[5] resources of Indiana. IDNR's responsibility to protect and properly manage the fish and wildlife resources is not conditioned on the owner of those resources. In other words, IDNR can protect and properly manage resources that are both publicly and privately owned.

[32] Even assuming that Section 14-22-1-1 is ambiguous, which I do not believe it is, looking at all the statutes in Article 22 leads me to the inevitable conclusion that the legislature intended to give IDNR regulatory power over all wild animals.[6] For example, Indiana Code section 14-22-2-3 outlines the general duties of the director, and provides that the director can regulate wild animals on both public and private property:

---

[4] This is essentially what the trial court found: "The deer purchased by Whitetail Bluff and offspring thereof, are privately owned and are not the property of the people of the State of Indiana. Therefore the animals are not subject to regulation by DNR by virtue of the provisions of Indiana Code § 14-22-1-1." Appellants' App. p. 509.

[5] For purposes of Indiana Code article 14-22, "wildlife" means "all wild birds and wild mammals." Ind. Code § 14-8-2-320.

[6] In fact, Whitetail Bluff concedes that its hunters comply with other parts of Article 22, such as the time, licensing, and firearms used in its guided hunts. Appellants' App. p. 21, 30, 480.

> (1) Provide for the protection, reproduction, care, management, survival, and regulation of wild[-]animal populations *regardless of whether the wild animals are present on public or private property in Indiana.*
>
> (2) Organize and pursue a program of research and management of wild animals that will serve the best interests of the resources and the people of Indiana.

(Emphasis added); *see also* Ind. Code § 14-22-2-5 ("The director or the director's representative may . . . enter into or upon *private or public property* for the following purposes: (1) Managing and protecting a wild animal found upon or within the property. (2) Killing or removing a wild animal that is considered a nuisance or detrimental to overall populations." (emphasis added)). In addition, Indiana Code section 14-22-2-6 provides that the director shall adopt rules that

> (4) Establish the methods, means, and time of:
>
>> (A) taking, chasing, transporting, and selling; or
>>
>> (B) attempting to take, transport, or sell;
>
> wild animals or exotic mammals, with or without dogs, in Indiana or in a designated part of Indiana.

[33]     Other statutes in this article specifically grant IDNR the authority to regulate *privately owned* wild animals. According to the game-breeders statute, IDNR may issue a license to (1) propagate in captivity and (2) possess, buy, or sell game birds, game mammals, or furbearing mammals protected by Indiana law. Ind. Code § 14-22-20-1. The wild-animal-permit law establishes a permit process for non-zoo entities to possess wild animals. Ind. Code ch. 14-22-26. Finally, the shooting-preserves statute

provides that a licensed person may propagate and offer for hunting the following animals that are captive-reared and released: pheasant, quail, chukar partridges, mallard ducks, other game-bird species that IDNR determines by rule, and species of exotic mammals that IDNR determines by rule. Ind. Code § 14-22-31-7.

[34] These varied examples show that the legislative scheme was to grant the State the authority to protect and manage animals both wild and domesticated, even those it does not own, and even when the animals are on private property.[7] Using this authority, I believe that IDNR can regulate canned hunting and specifically Whitetail Bluff's high-fence hunting operation.[8]

[35] Finally, I understand that a fairness argument can be made, but Whitetail Bluff has not made an estoppel argument here. *See Brown v. Branch*, 758 N.E.2d 48, 51-52 (Ind. 2001) ("Estoppel is a judicial doctrine sounding in equity. Although variously defined, it is a concept by which one's own acts or conduct prevents the claiming of a right to the detriment of another party who was entitled to and did rely on the conduct."). That is, Whitetail Bluff does not argue that IDNR is estopped from regulating it because of a letter IDNR sent Whitetail Bluff in 1999. However, the

---

[7] I disagree with the Seventh Circuit's decision in *DeHart v. Town of Austin, Indiana*, 39 F.3d 718 (7th Cir. 1994). It is well established that we are not bound by the Seventh Circuit's interpretation of Indiana law. *See Evan v. Poe & Assocs.*, 873 N.E.2d 92, 103 (Ind. Ct. App. 2007). Moreover, the statute at issue in *DeHart* was an earlier version of Section 14-22-1-1, and that statute was organized differently than the statute is organized today. *Compare* Ind. Code § 14-22-1-1 *with* Ind. Code § 14-2-1-2 (1993). Finally, as explained above, I believe that our current statutory scheme allows IDNR to regulate high-fence hunting.

[8] It would make little sense that the State could not regulate wild animals privately owned when the State can regulate domesticated animals privately owned. That is, the State requires pet owners to have their dogs and cats vaccinated against rabies, 345 Ind. Admin. Code 1-5-2; requires swine and cattle that are transported into our state to be tested for brucellosis, 345 Ind. Admin. Code 3-4-2.5 & 345 Ind. Admin. Code 2-6-2.5; imposes specific duties on cattle owners when a program to control and eradicate brucellosis has begun in a county, Ind. Code § 15-17-8-9; requires cattle and goats who test positive for tuberculin to be condemned, Ind. Code § 15-17-7-6; requires cattle to be quarantined when brucellosis is detected, Ind. Code § 15-17-8-10; and prohibits the feeding of trash to swine, Ind. Code § 15-17-10-16.

letter, which came from a single person in IDNR's law-enforcement division, plainly cautioned: (1) "*At this time* we can find nothing illegal or contrary to our hunting laws regarding your business proposal and plans as detailed in your letter" and (2) "be aware of the fact that *state statutes and rules may change in the future* that would disallow the type of business venture that you have described to us. Whether or not previously established businesses of this type would be allowed to continue after the possible law change is *unknown at this time*." Slip op. at 4 (emphases added). Because Whitetail Bluff has been operating for more than a decade on a letter from a single person in IDNR that cautioned IDNR's position may change and Whitetail Bluff does not raise estoppel, I do not think that a fairness argument is persuasive.

[36] Because IDNR may protect and properly manage the fish and wildlife resources of Indiana—regardless of who owns them—I believe that IDNR has the authority to regulate high-fence hunting under our current statutory scheme. Therefore, I would enter summary judgment in favor of IDNR.